[No. 4589–II.   Division Two.   October 21, 1980.]

BARBARA BRISTER, ET AL, *Respondents,* v. THE COUNCIL OF THE CITY OF TACOMA, ET AL, *Appellants.*

MAYER BUILT HOMES, INC., *Appellant,* v. WEDGEWOOD PARK, INC., ET AL, *Defendants,* BARBARA BRISTER, ET AL, *Respondents.*

*Harold T. Hartinger, Robert R. Hamilton, City Attorney,* and *Harding T. Roe, Assistant,* for appellants.

*Paul J. Kleinwachter,* for respondents.

PETRIE, J.—This is the saga of a real estate developer's attempts to construct multifamily housing on portions of a 29.5–acre tract of land in Tacoma zoned "R–2", single family residential, and encumbered by restrictive deed covenants which prohibit business or commercial use or any use other than single family residences.

The cause comes to us on an appeal by the City of Tacoma and by Kurtis R. Mayer, d/b/a Mayer Built Homes, from a 1980 judgment which (1) reimposed the

restrictive deed covenants which previously, under specified restrictions, had been removed from portions of the land by a judgment in 1976; (2) enjoined Mayer from building anything but single family residences on the entire property; (3) provided a means of dissolving the injunction upon Mayer's presentation and the court's approval of a plan for development of a "buffer zone" between portions of the property and neighboring residential areas; (4) vacated and voided rezone ordinances, site plan approval, and plat approval adopted by the City of Tacoma for the property; (5) held Mayer in contempt of court for having disobeyed the court's 1976 judgment; (6) assessed "reasonable attorneys' fees" against Mayer; and (7) reserved jurisdiction in the cause for the purpose of exercising equitable jurisdiction and review over the development of the property. We affirm in part and reverse in part.

### PROCEDURAL BACKGROUND

Mayer acquired title to the tract on September 12, 1974 under a deed from Wedgewood Park, Inc., who, in turn, had acquired title by a fulfillment deed of the same date from Westgate, Inc.[1] Each deed recited that the conveyance was made subject to "all restrictions of record" and also provided:

> Grantee covenants that the property shall not be used for business, commercial or industrial use or for any use other than single family residences. This covenant shall run with the land and shall be binding upon the Grantee and its successors and assigns in title for a period of 30 years from September 12, 1974.

In 1976 Mayer brought an action in Superior Court for Pierce County against Westgate and Wedgewood Park in

---

[1]The deed from Westgate, Inc., to Wedgewood Park, Inc., was given in fulfillment of a contract of purchase dated July 15, 1965, paragraphs 2, 7, and 9 of which required the purchaser to perform certain functions and duties including compliance with a covenant running with the land which limited improvements to single family residences, and paragraph 10 of which provided in part:

> In any suit or action to enforce any covenant of this contract . . . the Purchaser agrees to pay a reasonable sum as attorneys' fees . . .

which he declared an intention to develop a portion of the land as townhouses and apartment buildings. The court unconditionally decided that Mayer's title was free from any restrictions imposed by paragraphs 2, 7 and 9 of the contract of purchase between Westgate and Wedgewood, but only provisionally and restrictively removed the deed covenant restrictions. Paragraphs 3 and 5 of the 1976 judgment provide:

3. That the title of the plaintiff is subject to the restrictions set forth in the deeds dated September 12, 1974, and recorded September 19, 1974, under Auditor's Fee Nos. 2571931 and 2571932, wherein Westgate, Inc., and Wedgewood Park, Inc., respectively, are the grantors; PROVIDED, HOWEVER, that such restrictions shall not prohibit the erection of residential townhouses and apartment buildings in accordance with local, state, and federal zoning, environmental, and other governmental regulation now or hereafter applicable to the property and in accordance with the following special restrictions:

(a) Residential townhouses and apartments shall be separated from Westgate's Wedgewood Park Addition, Book 31 of Plats, pp. 14 and 15, and Westgate's Wedgewood Park 2nd Addition, Book 39 of Plats, pp. 47 to 50, incl., by a buffer zone of single family detached residences comprising not less than 41% of the plaintiff's above described ownership.

(b) Residential townhouses and apartment buildings shall be limited in height to three levels not more than two and a half stories high and shall be constructed to standards compatible with the neighborhood, and of a quality and general concept comparable to that of the Polynesian Apartments and College Lake Apartments and with an exterior finish comparable to the plaintiff's development known as Steilacoom Woods in Steilacoom, Washington.

(c) Said property shall be developed in accordance with plans stipulate of the plaintiff, and any modification thereof which shall be approved by the Court. Developments shall proceed in such manner as to protect the interests of the owners of adjacent property, including

the development of the single family buffer zone simultaneously with or preceding the development of the multiple family dwelling area, completion of landscaping, and screening.

. . .

5. That the court hereby reserve[s] jurisdiction in this cause for the purpose of exercising judicial oversight with respect to the development of the plaintiff's above described property, changes and modifications required by governmental authority, and for other appropriate and proper matters justifying an exercise of equitable jurisdiction.[2]

There was no appeal from that judgment; nor has any party to this proceeding petitioned to modify the 1976 judgment.

Following entry of that judgment Mayer filed rezone applications with the City of Tacoma. He requested rezoning of the multifamily area from R–2 to the less restrictive classification of R–4–L PRD, low density multiple–family planned residential development district, and he requested rezoning of the "buffer zone" area from R–2 to the more restrictive classification of R–2–PRD, one–family planned residential development district. The city's planning department recommended approval of the R–2 request and denial of the R–4–L PRD request. The matter then went before the city's hearing examiner. The examiner noted (and filed as an exhibit), the Superior Court's 1976 findings,

---

[2]Finding of fact No. 6–4, which supports paragraphs 3 and 5 of the court's 1976 judgment as to judicial oversight, provides:

"It is reasonably necessary for the court to reserve jurisdiction in this cause and to retain judicial oversight in the platting and development of the Mayer Built Property to the end that:

"(a) Development proceeds in accordance with the stipulation and plan presented to and approved by the Court and in such manner as to protect the interests of adjacent properties, including but not limited to the development of the single family buffer zone simultaneously with or preceding the development of the multifamily dwelling area and completion of landscaping and screening as provided by the plan.

"(b) Changes and modifications required by governmental authority will receive judicial review; and

"(c) For other appropriate and proper matters justifying an exercise of equitable jurisdiction."

conclusions, and judgment. Specifically, the examiner stated in his report to the city council that the court "reserved jurisdiction for the purpose of exercising judicial oversight with respect to the development of the plaintiff's above described property."

. Notwithstanding the hearing examiner's recognition of the 1976 court action, he observed that "this decision has no effect upon the City of Tacoma, who was not a party thereto . . ." On January 17, 1978, the city council adopted an ordinance reclassifying the property into two requested classifications.

Next, Mayer obtained from the city council tentative approval of a plat of the buffer zone known as Joseph Mayer's First Addition. Mayer then sought site plan approval to develop 46 single family residences within the buffer zone. The planning department denied the application on the basis that it was inconsistent with policies previously established by Tacoma's land use management plan. The department noted, among other items, that Mayer's application indicated he would retain ownership to the houses and would rent the premises to qualified tenants under a section 8 housing proposal of the United States Department of Housing and Urban Development.[3] The department's denial was based essentially on the determination that the average size of the planned units, revised to 1,016 square feet, was considerably less than the average size of neighboring houses to the north and east of the project. Protesting neighbors expressed dissatisfaction with the project mainly on the basis of their belief that a 46–unit, low income rental project would adversely affect the neighborhood and was inconsistent with Mayer's previously announced plans for the development.

The matter was presented to the city's hearing examiner, and following several hearings he recommended partial and

---

[3]Under a section 8 controlled proposal, the federal government guarantees a specified rental to the owner who rents to qualified tenants who, in turn, pay a portion of that rent equal to 25 percent of their income. 42 U.S.C.A. § 1437f.

conditional approval. A key condition recommended by the examiner was that Mayer modify the project to provide an average living area for the planned units of 1,200 square feet *or,* alternatively, that he present to the City through an independent appraisal assurance that the units as planned would not adversely affect the neighborhood.[4] Both Mayer and the protesting neighbors were dissatisfied with the hearing examiner's final report. Nevertheless, only Mayer appealed to the city council, and that appeal was limited to the examiner's first alternative condition, *i.e.,* that the project be revised to provide an average of 1,200 square feet per unit.

Prior to city council action on Mayer's appeal, he did provide, through an appraiser's report, evidence that the project as planned would not adversely affect the neighborhood. The city council accepted this report without holding a hearing on the sufficiency of the report and without referral to the hearing examiner for a hearing on that issue. Accordingly, Mayer dismissed the appeal, and the city council adopted a resolution on June 3, 1979 which, by its terms "tentatively accepted and approved" the site plan for Joseph Mayer's First Addition subject to the conditions set forth in the two reports of the hearing examiner.[5]

---

[4]The alternative provided: "Or, alternatively, the applicant shall provide that the homes which the applicant proposes to build have and maintain generally all of the amenities of single–family homes such as has been presented at this hearing; and additionally, assurance is provided by the applicant in the form of an independent, qualified appraisal which would show that the development of the single–family homes, as submitted by the applicant to the Examiner, will not have any adverse effect upon the surrounding neighborhood nor its property values, but rather will provide the proper buffering effect which is consistent and in accordance with Policies A and C of the Land Use Management Plan, i.e., that these single–family homes as proposed by the applicant at this hearing, and when used as rentals, will not have any adverse effects upon the existing residential area."

[5]The resolution recited as a fact in part:
WHEREAS the appellant [Mayer] has subsequently complied with the alternative condition of the Hearings Examiner's report of May 2, 1979, so as to render the appeal moot;

On July 3, 1979 the protesting neighbors sought a writ of certiorari in Superior Court for Pierce County seeking judicial review of Tacoma's "re–zone and site plan approval requested by Mayer." The affidavit in support of the application for this writ averred in part that the site plan approval allowed construction of "poor quality, small, rental buildings" in the buffer zone incompatible with homes in the area and inconsistent with the conditions of the 1976 judgment. The writ issued and the cause was assigned to the same department of the court which entered the 1976 judgment. Mayer filed a motion for summary judgment and, later, a motion to consolidate the certiorari action with the 1976 proceedings "for all purposes." On August 13, over the objections of the protesting neighbors, the court signed an order which "consolidated for all purposes" the two proceedings. The order also joined several protesting neighbors as parties defendant in the 1976 action, but the court refused to dismiss Westgate, Inc., from the consolidated actions, despite its counsel's request to be dismissed. On September 18 the court signed an order striking the names of several previously protesting neighbors as parties plaintiff in the certiorari action. On that same date the court also heard testimony on the neighbors' order to show cause why Mayer should not be temporarily enjoined from proceeding with building plans. Following that hearing, the court orally expressed an intention to enjoin Mayer pending resolution of the issues presented by the consolidated actions, but the court at that time did not enter any findings of fact or an injunctive order.

Mayer sought discretionary review in this court of the trial court's oral ruling. Mayer also filed in this court a motion to order disqualification of the trial judge from hearing further proceedings in the consolidated actions. We declined to accept review for the reasons that no written

---

Later, on September 11, 1979, after the writ of certiorari issued in this cause, the city council adopted a resolution which granted final plat approval for Joseph Mayer's First Addition as recommended by the hearing examiner.

order had yet enjoined Mayer from proceeding with the development and the temporary restraining order previously issued had by its terms automatically expired when the show cause proceedings were heard. We also held that Mayer's request to disqualify the trial judge was untimely filed.

Thereafter, Mayer filed a motion in Superior Court to disqualify the judge who had been presiding over the consolidated actions. The motion was denied. The protesting neighbors moved to amend their complaint, seeking damages for costs and attorney fees, but they did not specifically seek modification of the 1976 judgment. The motion was granted. Ultimately, the matter proceeded to trial, and final judgment was entered on February 22, 1980.

We granted accelerated review and now hold (1) the trial court erred by invalidating the City of Tacoma's rezone ordinance and its resolutions which granted plat approval of Joseph Mayer's First Addition; (2) the trial court properly determined that the City's resolution granting site plan approval was arbitrarily enacted; (3) the trial court erred in imposing the contempt order and in awarding attorneys' fees; and (4) the trial court erred by modifying the 1976 judgment. Accordingly, we reverse portions of the judgment entered and remand the cause for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

### DISQUALIFICATION OF TRIAL JUDGE

Before reaching the merits of the appeal, we first consider Mayer's assertion that the trial judge should have recused himself. Mayer's affidavit of prejudice which attempted to assert his statutory right of disqualification was not timely filed. The trial court made several discretionary rulings before the affidavit was filed. Hence, disqualification does not follow as a matter of right. *State v. Dixon*, 74 Wn.2d 700, 446 P.2d 329 (1968).

Nevertheless, Mayer contends that the trial judge pre-

judged the case at the hearing on Mayer's motion for summary judgment when the court was first advised that the plan for the buffer zone contemplated construction of single family homes which would be rented to low and moderate income families who would receive rent subsidies under section 8 of the United States Housing Act of 1937, Pub. L. No. 93–383, § 201(a), 88 Stat. 633 (1974). Mayer asserts that from that point until the conclusion of the trial and entry of final judgment the trial judge acted in an adversary capacity in opposition to Mayer's cause.

In order to evaluate this contention properly we note first that a basic disagreement arose at the summary judgment hearing between the trial judge and Mayer's counsel as to the import of the 1976 judgment. Mayer's counsel interpreted the 1976 judgment as reflecting the court's reservation of jurisdiction over the planning and construction of the townhouses and apartments but not over the development of the buffer zone. On the other hand, the trial judge asserted that under the terms of the judgment he reserved judicial oversight over the whole project and that Mayer was required to sell (and not rent) the individual houses in the buffer zone. In our opinion, both positions are wrong.

Paragraphs 3 and 5 of the 1976 judgment clearly indicate the trial court's asserted reservation of jurisdiction over the entire project, but paragraph 3(c) specifically declares that the

> property shall be developed in accordance with plans *stipulate* of the plaintiff [Mayer], and any *modification* thereof which shall be approved by the Court.

(Italics ours.)

Mayer's express stipulation filed with the court in 1976, insofar as it defined his responsibilities in the buffer zone, declares simply that the housing in the buffer zone shall be "single–family detached residences." There is no indication in the judgment that Mayer would be prohibited from retaining ownership of the property; nor is there any specification as to the size and quality of the buffer zone houses.

True, Mayer testified in 1976 that his intention was to sell the sites to individuals once the houses were built, but the judgment which defines his responsibilities does not mandate that action.[6]

This basic disagreement first became manifest on the record on August 13, 1979, when counsel for the protesting neighbors, arguing in opposition to Mayer's motion for summary judgment, told the court that "the developer now seeks to put in low–income Section 8 federally subsidized houses." The court immediately interjected, "In the buffer zone?" Thereafter, throughout the remainder of the hearing, the court repeatedly expressed disbelief that anyone would sincerely assert that "Section 8 rental units . . . would not have an adverse effect" upon the neighborhood.

The differences between the trial judge and Mayer's counsel became even more apparent on September 18, 1979 at the show cause hearing in which the protesting neighbors sought a temporary injunction to prohibit further development of the project. During direct testimony of witnesses testifying at that hearing, the court conducted what appears to us to be extensive "cross–examination" of Mr. Mayer and the appraiser upon whom he relied for the fact issue of the effect of the project upon the neighborhood. Particularly aggressive was the court's examination of the appraiser, Hulbert F. Rice, after he had expressed the opinion that the project "would not have an adverse effect on the surrounding homes."[7]

---

[6]Mayer's testimony on the point was not a model of precision. Asked what his plans were for development of the property in the buffer zone, he responded:

A. Well, I will develop the land, I'm not sure whether I will build single–families or not.

Q. Will the single–family lots be placed on the market for sale to other people?

A. I would say so.

Q. And with respect to the multi–family area, what portion, if any, would be put on the market for sale?

A. The multi–family will not be put on the market for sale.

[7]Indicative of the nature of the court's examination of Mr. Rice is the following:

Further indication of the court's attitude toward the issues in the case occurred at the beginning of the trial on

"THE COURT: Mr. Rice, are you telling the Court that a low income subsidized H.U.D. project of this type consisting of some 40 units, all rented, not privately-owned, would have no financial impact on the surrounding property?

"WITNESS: Let's go back.

"THE COURT: No, answer that question.

"WITNESS: Well, I can't—I've got—

"THE COURT: Just answer that question, yes or no. Are you telling me that? Truthfully? That it would have no impact upon the value of the surrounding property?

"WITNESS: May I explain the incident?

"THE COURT: No, you answer it, yes or no, first, and then I will let you give an explanation.

"WITNESS: It will not have any impact, and now may I explain?

"THE COURT: Yes.

"WITNESS: First of all, the idea of a H.U.D. supported rental housing project was never in my 'ball game.'

"THE COURT: Well, put it in your 'ball game,' because I want you as an expert to answer the question.

"WITNESS: Okay. In my opinion the ownership of single-family residential property—let's do it this way—the value level of single-family residential property is maintained to a great degree by its management, by ownership. We speak of the high degree of private ownership. If we have a neighborhood that's run-down, naturally, we tend to see values drop. So management is vital. If we have good management, and I'm assured that there will—

"THE COURT: What if you don't have good management?

"WITNESS: Well—

"THE COURT: In five years, two years, ten years—What if you don't have good management?

"WITNESS: Well, the answer to that is—I've been in the best country-club areas in west coast cities where individual houses didn't have good management and they're run down.

"THE COURT: I know, but the question is—supposing, perhaps through no fault of Mr. Mayer in a couple years the management is not good for this forty some unit rental project and maintenance is not up to what it would be in nice private areas, what would happen?

"WITNESS: Okay. Now, I'm a real estate appraiser I'm going to analyze the value—what's the job of an appraiser? To estimate value or to talk about these things?

"THE COURT: I want to know whether it would have an impact upon the surrounding neighborhood's financial value.

"WITNESS: If the properties are well built and well maintained, they'll have absolutely no impact. If I go across the street, as I did months ago, to the east of the subject property, there were run-down homes. I can't remember just exactly where, but there were several very shabbily maintained residences to the east, and they have probably had an adverse effect on the immediately adjoining properties.

the merits when counsel for the protesting neighbors suggested the court could set aside the 1976 judgment and modify the terms thereof by reimposing the deed covenants on that portion of the property upon which Mayer had planned to build the townhouses and apartments. When Mayer's counsel objected on the basis that no petition to modify the 1976 judgment had been filed by any party, the court responded:

> Counsel, this Court has jurisdiction to amend or modify its former ruling in equity, has continuing jurisdiction. Your objection is overruled. Your motion to strike is denied.

Indeed, at the conclusion of the trial, the court did modify the 1976 judgment. Finally, without conducting any hearing on the issue of contempt, the court found Mayer in contempt of court after noting Mayer's critical midtrial letter to the editor of a local newspaper. As sanctions for that contempt the court imposed attorneys' fees in the amount of $11,406.

■ The thrust of Mayer's contention on this issue is that he was denied due process of law by being involuntarily subjected to a trial before a biased judge who had prejudged the essential fact issues before hearing the evidence, who conducted the trial in an obdurate manner, and who injudiciously assumed the role of opposing counsel. There is a dearth of authority defining appellate review standards applicable to this contention. Certain it is that the common law as well as the federal and state constitutions guarantee to a litigant a trial before an impartial tribunal, be it judge or jury. *State ex rel. McFerran v. Justice Court*, 32 Wn.2d 544, 202 P.2d 927 (1949). Indeed, the law goes farther than requiring an impartial judge; it also requires that a judge appear to be impartial. *State v. Madry*, 8 Wn. App. 61, 504 P.2d 1156 (1972). The critical concern in determining whether a proceeding appears to be fair is how it would

---

If they're sold to new ownership and are maintained, then the values will come back. I can't conceive of forty-six units going down-hill all at once."

appear to a reasonably prudent and disinterested person. *See Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976).

We look for assistance from the Code of Judicial Conduct. Insofar as the fact pattern of this case might be applicable, the only suggestion of disqualification is contained in CJC 3C(1)(a) as follows:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

We note also a judge's adjudicative responsibilities include that he "should be unswayed by partisan interests, public clamor, or fear of criticism" and that he

should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

CJC 2A.

The extent to which the trial judge entered the "fray of combat" (*see Egede–Nissen v. Crystal Mountain, Inc.,* 93 Wn.2d 127, 606 P.2d 1214 (1980)) is most distressing; the nature of several of the remedies fashioned by the court, as will be demonstrated, was erroneously conceived. Nevertheless, we cannot and do not hold that a new trial must be granted solely on the basis that Mayer was denied due process of law by being involuntarily subjected to a trial before a biased judge.

CONTEMPT AND ATTORNEYS' FEES

We turn them to the several remedies fashioned by the trial court. The judgment entered by the court on February 22, 1980, recites in part:

That Kurtis R. Mayer, d/b/a Mayer Built Homes, has disobeyed a lawful judgment of this Court entered in Cause No. 238547 on June 25, 1976, and is in contempt of Court.

■ The record reflects that the court failed to proceed as required by RCW 7.20.040.[8] No affidavit of alleged contempt was ever filed, and no show cause proceedings were ever initiated. Mayer has been denied due process of law on the issue of contempt. Accordingly, that portion of the judgment which declared him in contempt of court must be stricken. *See In re Moore,* 25 Wn. App. 565, 610 P.2d 927 (1980).

Obviously, therefore, attorneys' fees cannot be imposed as sanctions for the contempt. The protesting neighbors contend, however, that attorneys' fees can be assessed under authority of the clause in the contract under which Wedgewood Park, Inc., Mayer's predecessor in title, agreed to purchase from Westgate, Inc., in 1965. (See footnote 1.) Two of the protesting neighbors contend they are third–party beneficiaries of that agreement.

That assertion fails for either of two reasons. The 1976 judgment specifically decreed that Mayer's title was "free from the restrictions imposed by" the paragraphs of the 1965 contract of purchase between Westgate and Wedgewood Park which limited improvements to single family residences. Although these two protesting neighbors were not parties to the 1976 proceedings, they have now been made parties to that cause "for all purposes," and they have specifically sought enforcement of that judgment.

Furthermore, and conceding for purposes of this opinion that these two protesting neighbors have (and are presently pursuing) valid third–party beneficiary rights to enforce a contractual covenant running with the land to limit the development of the entire tract to single family residences (*see* 5 R. Powell, *Real Property,* p. 223 *et seq.* (1980)), the

---

[8]RCW 7.20.040 provides:

"In cases other than those mentioned in RCW 7.20.030, before any proceedings can be taken therein, the facts constituting the contempt must be shown by an affidavit presented to the court or judicial officer, and thereupon such court or officer may either make an order upon the person charged to show cause why he should not be arrested to answer, or issue a warrant of arrest to bring such person to answer in the first instance."

real issue is whether those beneficiaries can successfully recoup attorney fees because of the "promise" made by Wedgewood Park, Inc., as purchaser under paragraph 10 of that contract to pay reasonable attorney fees in an action to enforce a "covenant" of that contract. The promise made is not specifically designated in the contract as a covenant running with the land. That issue has not been briefed by the parties; and, in view of the resolution of other issues in this appeal, is better left unresolved until the issue is appropriately presented to a trial court in future proceedings, if any.

## MODIFICATION OF 1976 JUDGMENT

The 1980 judgment from which this appeal was taken modifies the 1976 judgment from which no appeal was taken. The 1980 judgment enjoins activity previously authorized under the 1976 judgment; imposes new requirements for court approval of development plans; and revives private covenants previously adjudicated to have been extinguished. All these modifications were made sua sponte in the absence of any attempt by the protesting neighbors to invoke the extraordinary and inherent power of the court consistent with the provisions of CR 60(c).[9]

█ The 1976 judgment became final when the time for appeal expired; it became binding as to all parties then properly before the court. Additional persons, not party to that action, most certainly have recourse to the courts to assert whatever rights they may have to enforce covenants limiting Mayer's right to develop the land. Nevertheless, such persons must properly invoke the jurisdiction of the court to enforce those covenants. Here, the protesting neighbors specifically sought to enforce the 1976 judgment which adjudicated the rights of parties then before the

---

[9]CR 60(c) provides:

"This rule [relief from judgment or order] does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding."

court. Those same protesting neighbors were made post-judgment parties plaintiff to the 1976 action "for all purposes." They never, however, sought modification of the judgment. The court simply had no jurisdiction to modify that which became final in 1976.

In short, we hold that the trial court misperceived the precise issues before it. Accordingly, we set aside those portions of the 1980 judgment which modify the provisions of the 1976 judgment; and we specifically reinstate the provisions of that 1976 judgment and hold them applicable to the parties who have been made parties to this cause "for all purposes." *See State ex rel. Gaupseth v. Superior Court,* 24 Wn.2d 371, 164 P.2d 890 (1946).

As a result, Mayer may reapply to the City of Tacoma for site plan approval, subject to judicial oversight powers retained in the 1976 judgment. In view of all the circumstances attendant to the trial and appeal of this cause we direct the presiding judge of Pierce County Superior Court to assign any future proceedings in this cause to a department of the court other than Department 7.

### TACOMA'S ORDINANCES AND RESOLUTIONS

Although the protesting neighbors have challenged all of the proceedings of Tacoma's city council, the only expressed disapproval pertains to the City's resolution which granted site plan approval. In that instance, we agree with the protesting neighbors that the City acted arbitrarily in finding as a fact (without a hearing on the issue) that Mayer's filing of the appraiser's report "complied with the alternative condition of the Hearing Examiner's report of May 2, 1979." That portion of the 1980 judgment which vacated and voided site plan approval of the buffer zone is affirmed.

We deem it unnecessary to comment on the protesting neighbors' challenges to the validity of the City's rezone and plat approval. The trial court's voidance of that ordinance and those resolutions is reversed.

Judgment reversed in part and affirmed in part as set forth herein. Each party shall bear its own costs on appeal.

PEARSON, A.C.J., and PETRICH, J., concur.

Reconsideration denied November 24, 1980.

Review denied by Supreme Court February 13, 1981.