[Nos. 20227-8-I; 21593-1-I. Division One. January 30, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. CHRISTOPHER J. BRENNER, *Appellant.*

*Karen A. Klein,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jeffrey Baird* and *Jeanne E. Tweten, Deputies,* for respondent.

WEBSTER, J.—Christopher J. Brenner appeals his conviction of second degree murder and second degree burglary asserting numerous trial court errors. We affirm.

## FACTS

Chris Brenner and Troy Green decided to steal a transmission from a wrecking yard in Kent on November 30, 1985. They collected two handguns before leaving Chris Brenner's house to take on their journey: a .357 magnum and a .22 caliber pistol. Late at night they drove to a deserted road behind the yard of an automobile wrecking business where Brenner parked his car. The two traversed a field on foot to an 8-foot fence surrounding the wrecking yard. Green climbed over the fence and selected a transmission to steal. After hoisting it over the fence they carried the transmission a short distance. Because the transmission was heavy, Brenner decided to walk back to the road and get his car so that they could load it into his trunk.

Meanwhile, Casey Thompson, William Phelps and Sam Burns had been driving and decided to patrol the wrecking

yards in the same vicinity. The three had various connections to Kent wrecking yards, either as owner or employee. From time to time they would patrol the wrecking yards to prevent theft. While driving near one of the junkyards the three spotted Brenner's car parked on the side of the deserted road behind the wrecking yard. They did not know who owned the car or why it was there but they suspected that it was connected with an ongoing theft. Thompson and Phelps disabled Brenner's car by removing the coil wire and waited nearby for its owner to return. Burns drove home while his comrades removed the wire and returned with an axe and a club studded with nails.

Having left Green with the transmission, Brenner came back to his car and discovered that it would not start. Burns then drove up alongside Brenner's car and jumped out with the club in his hand. Burns approached Brenner, who remained seated in his car, and questioned him as to why he was behind the junkyard in the middle of the night. Green heard some commotion and ran back to Brenner's car. Green started fistfighting with Burns and Thompson. The men wrestled on the ground, and a gun went off. Hearing the gunshot, Brenner grabbed his gun and stepped out of his car. He fired his .357 into the air hoping to stop the fight. This apparently created no response from the men who continued their fisticuffs. Brenner testified that he immediately turned and saw Thompson coming at him with a gun. Brenner warned him, "stay back, I've got a gun." But according to Brenner, the man kept coming at him. Brenner lowered his gun and shot Thompson in the chest. Thompson bled to death.

The State charged Brenner with second degree murder and second degree burglary. A jury convicted Brenner following a lengthy trial, and the court sentenced him to 123 months in prison.

During voir dire, defense counsel examined a juror who had in the past served as a King County reserve police officer. Defense counsel asked juror Fisher, "I take it after several years you probably built up a pretty good bond with

a lot of police officers?" Fisher replied, "No, I wouldn't say so, because you move a lot." Counsel for both sides passed Fisher for cause on January 13, 1987. Thereafter, Fisher became foreman of the jury. On January 15, 1987, another prospective juror, who had been excused from jury duty, spoke with the court in the absence of the jury and counsel. The juror expressed his disappointment that he had been excused whereas Fisher had not. The juror pointed out that Fisher repeatedly met and lunched with a police officer. At the time of this colloquy defense counsel had one remaining peremptory challenge, but the court did not inform counsel of its discussion with the juror.

After trial had commenced, defense counsel learned that juror Fisher had been meeting with Officer Blum of the King County Police daily for lunch. Thereafter, the court conducted an examination of juror Fisher in which Fisher admitted meeting with the police officer daily but denied discussing the case. The court ordered juror Fisher to have no further contact with the officer until the conclusion of the case. Subsequently, defense counsel moved to strike juror Fisher for cause. Based on the fact that Fisher had responded in the negative when asked whether he had built up good bonds "with a lot of police officers", counsel argued that Fisher's answers on voir dire were untruthful. Counsel maintained that the defense was misled not to exercise its one remaining peremptory challenge so as to excuse Fisher. The court denied defense counsel's motion.

The day after the court admonished the juror not to meet with the officer, juror Fisher was seen with the officer. Counsel again moved the court for removal of Fisher, and the court again denied counsel's request.

## JUROR MISCONDUCT

Brenner argues that juror Fisher's answer on voir dire misled defense counsel when questioned whether he had "built up a pretty good bond with a lot of police officers". Brenner asserts that Fisher concealed information concerning his friendship with the King County police officer.

Brenner further asserts that Fisher's response to a question posed by the court in a special hearing during trial constitutes jury misconduct. The court asked Fisher how often he met with Officer Blum, and Fisher replied that they met daily. Brenner argues that this response is somehow untrue because Fisher did not specify that his daily meetings with the officer were for lunch and to drive home together.

■ Jury misconduct in the form of false answers on voir dire concealing material matters warrants granting a new trial. *State v. Simmons,* 59 Wn.2d 381, 392, 368 P.2d 378 (1962); *Smith v. Kent,* 11 Wn. App. 439, 444, 523 P.2d 446 (1974). Here, juror Fisher's answer to counsel's question on voir dire was not false although it may not have revealed all matters which the defense wished to know. The trial court believed the answer to be appropriate and correct. On voir dire, jurors are not obligated to volunteer information or provide answers to unasked questions. *State v. Gilmore,* 59 Wn.2d 514, 515–16, 368 P.2d 722 (1962). We find that the record does not show that Fisher responded with false answers or that he failed to volunteer necessary information.

Communications between a third person and a juror about an ongoing trial constitute misconduct which warrants a new trial if such communications prejudice the defendant. *State v. Murphy,* 44 Wn. App. 290, 296, 721 P.2d 30, *review denied,* 107 Wn.2d 1002 (1986); *see State v. Lemieux,* 75 Wn.2d 89, 91, 448 P.2d 943 (1968); *see also State v. Saraceno,* 23 Wn. App. 473, 474–75, 596 P.2d 297 (1979). Once misconduct is shown, prejudice is presumed. The State has the burden to overcome this presumption by proof beyond a reasonable doubt. *Murphy,* at 296.

■ We find that juror Fisher's daily meetings with Officer Blum do not constitute juror misconduct. At the very least, a juror must discuss the pending case with a nonjuror to create misconduct. In fact, courts have found no prejudice even where the juror has discussed the case with a third party or a witness. *See, e.g., State v. Theobald,* 78 Wn.2d 184, 186, 470 P.2d 188 (1970); *State v. Lemieux,* 75

Wn.2d at 90–91. Here, nothing in the record shows that Fisher discussed the case with anyone outside of the courtroom—including Officer Blum. The State proved to the satisfaction of the trial court that Fisher did not discuss the case with Officer Blum. The State thereby established beyond a reasonable doubt that no actual prejudice occurred.

Fisher's answers to questions posed by the court in the special hearing are characterized by counsel as lies. However, we find no misstatements of fact in Fisher's responses. The colloquy consisted of the following:

THE COURT:      And how often have you met with [Officer Blum] since the trial commenced?
JUROR FISHER:   Oh, I've talked to him daily.
THE COURT:      Daily?
JUROR FISHER:   Yes.
THE COURT:      What is it, a luncheon together or something?
JUROR FISHER:   We go down and eat soup together, yes.
THE COURT:      And has there been any kind of discussion, either by him or by you, concerning this incident?
JUROR FISHER:   No, sir.

Finally, Fisher's meeting with Officer Blum subsequent to the court's admonition not to meet with Blum, while not to be condoned, did not prejudice the defense. Because no evidence exists in the record showing that Fisher discussed the case with Officer Blum, no reasonable ground exists that would indicate Brenner was denied a fair trial.

### APPEARANCE OF FAIRNESS

We next address whether the trial court violated the appearance of fairness doctrine by not disclosing the contents of the discussion with the excused prospective juror. Brenner asserts that he was denied his right to a fair and impartial tribunal because the court violated the "appearance of fairness" doctrine. He argues that after the colloquy with the excused juror, the court had a duty to disclose the facts learned concerning juror Fisher. Counsel submits that

had the defense known juror Fisher was friends with a police officer, it would have peremptorily challenged him.

This State has long adhered to the "appearance of fairness" doctrine. "The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial." *State v. Madry*, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972). Generally, the appearance of fairness doctrine requires the court to inquire as to how the proceedings would appear to a reasonably prudent and disinterested person. *Chicago, M., St. P. & P. R.R. v. State Human Rights Comm'n*, 87 Wn.2d 802, 808, 557 P.2d 307 (1976); *Brister v. Council of City of Tacoma*, 27 Wn. App. 474, 486–87, 619 P.2d 982 (1980).

We find that the record does not indicate that a reasonably prudent and disinterested person would conclude that the proceedings were unfair. Prior to the court's colloquy with the ex–juror, Fisher had been extensively examined on voir dire. Counsel questioned Fisher on his 7–year work history with the King County Police. In addition, counsel learned that Fisher had previously served as a juror in a criminal case and had voted for acquittal. Counsel made a tactical choice to pass juror Fisher for cause even though Fisher had several years of police experience.

A person who has served as a reserve police officer for several years most probably has friends on the force. Jurors are not prohibited from otherwise meeting with their friends during pretrial jury selection or even during trial. Thus, the ex–juror's disclosure to the court did not reveal juror misconduct on the part of Fisher even if Fisher's conduct was unusual.

No authority supports the premise that the ex–juror's disclosure had to be communicated to defense counsel.[1] The trial court determined that the discussion with the excused prospective juror about a permissible event involving another juror whom counsel previously passed for cause

---

[1]We note, however, that the preferable and more prudential approach in this case was for the trial court to promptly inform both counsel of this information.

was unimportant. The court never discussed it with anyone. We likewise do not characterize the communication as ex parte because the discussion occurred after the prospective juror had been removed from the case.

Defense counsel asserts that had it known the information about Fisher's friendship with a police officer, it would have peremptorily challenged Fisher. However, this information could have been elicited during voir dire. The record shows that counsel probed into Fisher's past employment as a police officer. Apparently counsel determined it unnecessary to ask Fisher if he had a close friendship with any particular police officer. Thus, we conclude that the record contains no evidence that would lead a reasonably prudent person to believe that the proceedings were unfair.

### SELF–DEFENSE INSTRUCTION

We next examine whether the trial court properly instructed the jury as to the law of self–defense. Brenner asserts that the court erred in failing to provide the jury with proposed jury instruction 27. Brenner maintains that, in addition to the self–defense instruction given to the jury, the court should have provided a second instruction regarding justifiable homicide in resistance of a felony. Instruction 21, which the court gave to the jury, reads as follows:

> It is a defense to a charge of Murder in the Second Degree, Manslaughter in the First Degree, and Manslaughter in the Second Degree that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when committed in the lawful defense of the defendant or any person in the defendant's presence or company when the defendant reasonably believes that the person slain intends to inflict death or great personal injury and there is imminent danger of such harm being accomplished.
>
> The defendant may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the defendant taking into consideration all the facts and circumstances

known to the defendant at the time and prior to the incident. The force employed may not be more than is necessary.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. The State has met this burden if it has proven, beyond a reasonable doubt, each of the elements of the crime charged.

Counsel for defense proposed in addition to the above instruction the following:

It is a defense to charges of murder or manslaughter that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the actual resistance of an attempt to commit a felony upon the defendant or in the presence of the defendant.

An instruction is proper if it correctly states the law, is not misleading, and permits counsel to argue his or her theory of the case. *State v. Mark,* 94 Wn.2d 520, 526, 618 P.2d 73 (1980); *State v. Dana,* 73 Wn.2d 533, 439 P.2d 403 (1968). The instruction given here is virtually identical to the instruction approved of in *State v. Heath,* 35 Wn. App. 269, 666 P.2d 922, 925, *review denied,* 100 Wn.2d 1031 (1983). Thus, the instruction correctly states the law and is not misleading.

■ We find that instruction 21 as it stands permits Brenner to argue his theory of the case. The justifiable homicide defense applies only if the felony which was sought to be prevented threatens life or great bodily harm. *State v. Nyland,* 47 Wn.2d 240, 243, 287 P.2d 345 (1955); *see State v. Griffith,* 91 Wn.2d 572, 576, 589 P.2d 799 (1979). Instruction 21 allows self–defense in almost the same language: when the slayer believes the decedent intends to inflict death or great personal injury. Therefore, we find that the instruction given allows Brenner to argue his theory of the case.

Brenner argues that *State v. Negrin,* 37 Wn. App. 516, 681 P.2d 1287 (1984) stands for the proposition that the "attempt" language in his proposed instruction substantially differs from the "intends" language contained in

instruction 21. Brenner asserts that *Negrin* entitles him to both instructions. *Negrin* held that instructing the jury only as to "attempt" led the jury to believe that some actual physical attempt must be made by the decedent to justify defendant's act of self–defense. The *Negrin* court held that self–defense also protects those who act with reasonable belief that the decedent intended to commit great bodily harm and perceived imminent danger. The *Negrin* holding is inapposite here, where the only instruction given states "intends," which, according to *Negrin,* encompasses the type of conduct covered by the "attempt" language. Brenner could argue the more narrow actual resistance of a felony within the broader language of reasonable belief of intent. *See State v. Martineau,* 38 Wn. App. 891, 896, 691 P.2d 225 (1984), *review denied,* 103 Wn.2d 1020 (1985).

Although a party is entitled to instructions when there is substantial evidence to support them, he or she is not entitled to repetitious instructions. *State v. Heath,* 35 Wn. App. 269, 666 P.2d 922, 925, *review denied,* 100 Wn.2d 1031 (1983). Because justifiable homicide is limited to felonies where the attack on the defendant's person threatens life or great bodily harm, Brenner's proposed jury instruction simply repeats the substance of instruction 21.

## DEFINITION OF BUILDING

We next address whether the burglary statute includes wrecking yards within its definition of "building." Brenner relies on *State v. Flieger,* 45 Wn. App. 667, 726 P.2d 1257 (1986), asserting that a fenced area is as a matter of law not a building where its main purpose is not the protection of property therein. *Flieger,* at 671.

Burglary in the second degree requires a person to remain unlawfully in a building. RCW 9A.52.030(1). "Building" as defined by statute includes any fenced area used for "carrying on business therein, or for the use, sale or deposit of goods". RCW 9A.04.110(5). Case law has limited this definition to fences "erected mainly for the purpose of protecting property within its confines". *State v.*

*Roadhs,* 71 Wn.2d 705, 708, 430 P.2d 586 (1967); *see State v. Flieger,* 45 Wn. App. at 671. The court in *Roadhs* stated that if the fence serves as a boundary line or is erected for the *sole* purpose of aesthetic beautification, it does not fall within the burglary statute. *Roadhs,* at 708.

Brenner claims that the evidence produced at trial shows that the wrecking yard's fence was erected primarily to comply with state law. RCW 46.80.130 specifically requires wrecking yards to be enclosed by a wall or fence so as to obscure the nature of the business.

█ We find that Brenner is correct that the record contains evidence that the 8-foot fence is in place in compliance with state law. However, we find nothing in the record which could lead a trier of fact to any conclusion except that the wrecking yard constitutes a building. The record contains evidence that the wrecking yard's owner erected the fence to combat theft problems. Nothing in the record would support the conclusion that the owner erected the fence solely for the purpose of aesthetic beautification. The fact that the fence complies with state law aesthetic specifications does not detract from its purpose of protecting the auto parts within the yard. We note that another jurisdiction has found that the entry into a junkyard constitutes entry into a "building" for purposes of a similar burglary statute. *Jenkins v. State,* 230 A.2d 262, 275 (Del. 1967). Thus, we conclude as a matter of law that the wrecking yard constitutes a "building" for purposes of Washington's burglary statute.

Next, Brenner argues that he was deprived of his right to argue his theory of the case because the instruction given to the jury as to the definition of "building" does not include the case law refinements discussed above. The instruction given states:

> Building, in addition to its ordinary meaning, includes a fenced area used in carrying on a business or for the use, sale or deposit of goods.

We agree that this instruction misstates the law because it does not include the case law refinements of the term

"building" discussed above. However, because the fenced area surrounding the auto wrecking business constitutes a "building" as a matter of law, an instruction on this issue is unnecessary. We find the trial court's error harmless.

## FELONY MURDER

Brenner argues that the intervening actions of Burns, Phelps, and Thompson broke the connection between the killing and the burglary such that the killing did not occur "in the furtherance or flight from" the burglary.

■ Felony murder requires the killing to occur "in the course of and in furtherance of . . . or in immediate flight" from a felony. RCW 9A.32.050(1)(b). The question of whether the burglary had been completed at the time of the killing is a question of fact properly decided by the jury. *See State v. Daniels*, 119 Wash. 557, 560, 205 P. 1054 (1922). We find that the record contains substantial evidence from which the jury could have concluded that the killing occurred in the furtherance of or flight from the burglary. Brenner shot Thompson while he was in the process of starting his car so as to load stolen goods into it. Brenner left his home earlier that night intending to steal a transmission from a wrecking yard and took a .357 magnum pistol and ammunition with him. Thus, the record contains substantial evidence to support the jury's conclusion that the homicide occurred in the course of and furtherance of or flight from the underlying felony of burglary.

## EXCLUSION OF EXTRINSIC EVIDENCE

We next examine whether the trial court properly excluded extrinsic evidence as to past aggressive acts of Burns who acted in concert with the victim, Thompson.

The trial court permitted examination of Burns as to his having harassed persons in another car, chased them, and smashed their window. Brenner wished to present testimony of a third person to show that Burns was the first aggressor. The court determined that the additional testimony would only confuse and mislead the jury and excluded it pursuant to ER 403. ER 403 permits the court

in its discretion to exclude otherwise relevant evidence if its probative value is outweighed by the danger of confusion of issues and misleading the jury. Brenner contends that a court may not exclude critical evidence relevant to the central contention of a valid defense. *See State v. Young,* 48 Wn. App. 406, 413, 739 P.2d 1170 (1987).

The court determined that Burns' own testimony sufficiently established his aggressiveness. The court further concluded that the additional witnesses' testimony as to this matter would be unnecessary and would only confuse the jury.

■ We conclude that the court's exclusion of testimony did not deny Brenner his right to argue his theory of the case. Brenner could still show the jury that Thompson acted in concert with Burns who has aggressive and provocative tendencies. This supports Brenner's theory that Thompson was the first aggressor. Therefore, we find that the court did not abuse its discretion in excluding the testimony.

## LESSER–INCLUDED OFFENSE

■ Finally, we address Brenner's argument that the trial court erred in failing to instruct the jury as to the elements of criminal trespass in the second degree. Brenner maintains that he is entitled to a lesser–included offense jury instruction because the lesser crime contains each of the elements of the offense charged. *See State v. Workman,* 90 Wn.2d 443, 447–48, 584 P.2d 382 (1978). Criminal trespass in the second degree requires a person to enter premises not constituting criminal trespass in the first degree. RCW 9A.52.080(1). Criminal trespass in the first degree requires entry of a building. RCW 9A.52.070(1). Brenner's argument assumes that the jury could have found that the fenced area entered did not constitute a building. As stated above, the fenced area of the wrecking yard constituted a building as a matter of law. Therefore, because criminal trespass in the second degree does not contain a necessary

element of the offense charged, we conclude that the additional instruction was unnecessary.

Having found that Brenner's assignments of error are without merit, we affirm.

COLEMAN, C.J., and WINSOR, J., concur.

Review denied at 112 Wn.2d 1020 (1989).