[Nos. 31667-2-I; 31702-4-I;   Division One.   December 30, 1994.]
   31468-8-I.

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS
MICHAEL GANS, ET AL, *Appellants*.

THE STATE OF WASHINGTON, *Respondent*, v. B.D.W.,
*Appellant*.

*Lorraine Lee* of *Washington Appellate Defender Association*, for appellant Gans, et al.

*Andrew S. Dimmock* of *Associated Counsel for the Accused*, for appellant B.D.W.

*Norm Maleng, Prosecuting Attorney*, and *Pamela Mohr, Deputy*, for respondent.

KENNEDY, J. — Douglas Gans, Adrian Lombardi and B.W. each appeal their convictions of second degree burglary. The three climbed a 4-foot-high post and rail fence to enter a pasture at Bellevue's Kelsey Creek Park with the intent to inflict cruelty upon the occupant of the pasture, Pasado, a donkey. Gans and Lombardi assert that under the burglary statute, a fenced area of this sort can amount to a "building" only if it is for the deposit of "goods". They argue that Pasado cannot be "goods", because he served no commercial purpose. Additionally, all three Appellants argue that under the analysis established by *State v. Roadhs*, 71 Wn.2d 705, 430 P.2d 586 (1967), the "main purpose" of a fence determines whether the fenced-in area is a "building". They urge this court to decide as a matter of law that an animal pasture surrounded by a post and rail fence cannot constitute a building.

We conclude that Pasado was "goods" in the plain meaning of that term. We agree that whether a fenced area is a building must be determined by reference to the main purpose for erecting the fence. The primary purpose of a fence,

however, is a question of fact for the trier of fact. In each of the proceedings below, the trial court heard evidence concerning the nature of the fence and the purposes for which it was erected. Based on its findings as to the primary purposes for which the fence was erected, each court deemed the fenced-in pasture a building for the purpose of applying the burglary statute. Finding substantial evidence in the record to support those findings, and that the findings support the trial courts' conclusions of law, we affirm.

On the morning of April 16, 1992, caretakers at Kelsey Creek Farm Park in Bellevue discovered that the park's donkey, Pasado, had been beaten and killed the previous night. B.W., a juvenile, was subsequently charged with one count of second degree burglary and one count of cruelty to animals. A juvenile fact-finding hearing was held, at which B.W. was found guilty of both crimes.

At the hearing, the State established that at the time of the crime, Pasado was housed in a corral inside the park. The corral consisted of a large fenced-in area and small shed. The shed was 10 feet by 20 feet. The exterior walls of the shed formed one corner of the corral. One exterior wall contained a door for access to the shed. This door was kept padlocked to prevent access by individuals other than park staff. The interior wall contained a 4-foot-wide opening to allow Pasado to enter and exit the shed.

The fence surrounding the remainder of the corral was approximately 4 feet high. It was constructed with four 2-inch by 6-inch boards bolted to posts sunk into the ground. There was an 18-inch gap between the boards. The only other authorized access to the corral (besides through the shed) was through a padlocked gate in the fence near the shed.

The Kelsey Creek Farm recreation coordinator testified that the purpose of the fence and locked gates was to keep out unauthorized persons, including the many visitors to the park. She also testified that the fence served the purpose of

keeping Pasado in the corral. The City of Bellevue recreation coordinator testified that the purpose of the fence was to keep animals in and people out, as the City was concerned about liability.

At the close of the State's case, the defense moved to dismiss the burglary count, arguing that the State had failed to establish that the fence enclosing Pasado's corral was a building under Washington law.

The trial judge ruled that the analysis as to whether a fenced area constitutes a building proceeds on a case by case basis. He then found that the fence served the purpose of protecting Pasado, keeping people out of the corral and preventing anyone from removing Pasado from the corral. Given these purposes, the trial judge concluded that the fence was a building under Washington law.

An order of disposition was subsequently entered and this timely appeal followed.

Lombardi and Gans were both also charged with second degree burglary and cruelty to animals. They were jointly tried at a bench trial.

Gans and Lombardi stipulated to many of the facts at their trial. The stipulation described the shed and fence that comprised the corral. The shed was in a corner of the corral, was connected to the fence in two places and was 12 by 16 feet, with the one padlocked door providing access from outside the corral. The shed contained a 4-foot-wide opening inside the corral to allow Pasado to exit and enter. The shed was constructed to provide Pasado protection from the elements.

The fence surrounding the pasture was 4 feet high, with four parallel railings. The two gates in the fence were locked on the evening Pasado was killed, meaning that the only access to the pasture was over the fence. The fence's purpose was to keep Pasado in and visitors out, to prevent anyone from taking Pasado and to protect Pasado and visitors. The stipulation explicitly stated that the fence was not constructed for beautification.

The trial judge concluded that the purpose of the fence determined whether it was a building. He then stated:

> Keeping Pasado in, as the stipulation continues, was for the protection of the donkey. And the donkey is property, just as any domesticated animal in the state of Washington is property of some person or some governmental entity or some corporation.
>
> The fence, therefore, had the purpose of protecting property within its confines, specifically the donkey.

Report of Proceedings, at 50-51. The court specifically rejected the State's alternative argument that the Defendants committed burglary by entering Pasado's shed, apart from entering the fenced area. The court found both men guilty of both offenses.

Judgment and sentence was entered October 13, 1992, and this timely appeal followed.[1]

## DISCUSSION

■ A person is guilty of second degree burglary if "with intent to commit a crime against a person or property therein, he enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030.

> "Building", in addition to its ordinary meaning, includes any dwelling, *fenced area*, vehicle, railway car, cargo container, or any other structure used for lodging of persons or for carrying on business therein, or *for the use, sale or deposit of goods . . ..*

(Italics ours.) RCW 9A.04.110(5). In the instant case, the determination as to whether Pasado's corral was a "building" turns on whether Pasado was "goods" that had been deposited within the fenced area. *See State v. Flieger*, 45 Wn. App. 667, 670, 726 P.2d 1257 (1986). Whether Pasado was "goods" is an issue of statutory interpretation, reviewed de novo on appeal. *See Multicare Med. Ctr. v. Department of Social & Health Servs.*, 114 Wn.2d 572, 582 n.15, 790 P.2d 124 (1990).

■■ When interpreting a statute this court ascertains and gives effect to the Legislature's intent as expressed by the plain language of the statute. *American Legion v. Walla*

---

[1]On appeal, the Lombardi and Gans cases were consolidated and then linked with B.W.'s case.

*Walla*, 116 Wn.2d 1, 8, 802 P.2d 784 (1991); *State v. Wilbur*, 110 Wn.2d 16, 18, 749 P.2d 1295 (1988). In enacting RCW 9A.04.110(5), the Legislature did not provide a specific definition of "goods". Where the Legislature has used a term but has not defined that term, a reviewing court can refer to the dictionary definition to ascertain the term's meaning, unless a contrary intent appears from the statute. *American Legion*, 116 Wn.2d at 8.

■ "Goods" is defined as "tangible movable personal property having intrinsic value". *Webster's Third New Int'l Dictionary* 978 (1981). *See also State v. Flieger*, 45 Wn. App. at 671 (where homeowner testified that fence protected both property in backyard and items stored in a shed, court concluded that "goods" were stored in backyard). Having intrinsic value and being movable personal property, Pasado meets the definition of "goods". Accordingly, his corral was a "building", *i.e.*, the corral was fenced in and was used for the deposit of "goods".

Gans and Lombardi argue that this court should give "goods" a commercially related definition, citing Black's Law Dictionary 624 (6th ed. 1990). In Black's, however, items of merchandise and goods as defined by the Uniform Commercial Code (U.C.C.) are only part of the definition. The first words in the definition say: "Goods. A term of variable content and meaning. It may include every species of personal property or it may be given a very restricted meaning." Black's, at 694.

Neither is reference to the U.C.C. for a definition of "goods" helpful in this context.[2] The term "goods" is used in Article 2 of the U.C.C. to limit application of that statute to particular contracts. For instance, RCW 62A.2-105 excludes investment securities as "goods". The burglary statute has a different purpose: to give a broad inclusive description of what behav-

---

[2]Gans and Lombardi argue that the use of the term "goods" by the U.C.C. shows that the term was meant to refer to commercial goods when used by the Legislature in the burglary statute.

ior is punishable as burglary. Given these different purposes, the U.C.C. does not aid in interpreting RCW 9A.04.110(5).[3]

Lombardi and Gans argue that several statutory construction tools indicate that "goods" was not meant to refer to animals kept in a corral like Pasado's. First, they assert that "goods" must be read in conjunction with the remaining phrases and words used in the definition of "building". They argue that because these other terms relate to commercial endeavors or storage places ("railway car", "cargo container", "for carrying on business therein"), the term "goods" should have a commercial meaning. The argument is flawed, however, because the definition of "building" refers to several things that do not have an intrinsic commercial meaning or purpose, for instance, a "fenced area" a "vehicle" or "any other structure". RCW 9A.04.110(5).

Gans and Lombardi next argue that the Legislature used the term "property" in the burglary statute, RCW 9A.52.030, and the term "goods" in the definition portion, RCW 9A.04.110(5), evidencing the desire to apply a different meaning to "goods". This argument ignores the fact that the term "property" can refer to both real property and intangible property. RCW 9A.04.110(21). If the definition of "building" used the term property, it could be interpreted to say that one committed burglary by entering an area fenced in for the "use" of real property. This would make every criminal trespass a burglary. By using the term "goods", the Legislature avoided such an interpretation.

Finally, Lombardi and Gans argue that the Legislature could have included animal shelters in the definition of building, and its decision not to do so exhibits that animal shelters should not be buildings. However, RCW 9A.04.110(5) refers not only to fenced areas but to "any other struc-

---

[3]The difference is apparent in this hypothetical circumstance: the U.C.C. does not include in its definition of "goods" investment securities. However, if a defendant entered a cargo container and stole investment securities, that behavior should be punished as burglary, just as it would if the defendant stole merchandise.

ture" used for the deposit of goods. Therefore, that the statute does not specifically include animal shelters does not evidence an intent to specifically exclude animal shelters.

Under the plain meaning of the term "goods" Pasado was goods deposited or used within a fenced area. Resort to the U.C.C. or to various tenets of statutory construction to restrict the definition of goods does not alter this plain meaning.

Our Supreme Court has added an additional qualification before a fence can be deemed a building for purposes of the burglary statute. In order to be a building a fence must have as its main purpose the protection of the property inside the fenced-in area:

> Were [a] fence a mere boundary fence or one erected for the *sole* purpose of aesthetic beautification, it would not constitute a "structure" . . . where [a] fence is of such a nature that it is erected mainly for the purpose of protecting property within its confines and is, in fact, an integral part of a closed compound, its function becomes analogous to that of a "building" and the fence itself constitutes a "structure" subject to being burglarized.

*State v. Roadhs*, 71 Wn.2d 705, 708-09, 430 P.2d 586 (1967).[4] Thus, a fence's main purpose establishes as a matter of law whether that fence can be considered a "building" for purposes of charging burglary.

The primary purpose of a fence is a question of fact. In *State v. Brenner*, 53 Wn. App. 367, 768 P.2d 509, *review denied*, 112 Wn.2d 1020 (1989), Brenner's co-defendant climbed an 8-foot fence and absconded with a transmission, which the two then tried to load into Brenner's car. *Brenner*, 53 Wn. App. at 369-70. The court concluded that, although the junkyard owner was statutorily required to surround the junkyard with a fence or wall (for aesthetic reasons), the record contained substantial evidence that the owner constructed the fence specifically to combat theft. *Brenner*, at 378. Thus, the fence's pur-

---

[4]The compound in *Roadhs* was a large paved Public Utility District lot surrounded by a 6- to 7-foot fence with barbed wire at the top. *Roadhs*, 71 Wn.2d at 706. *See also State v. Livengood*, 14 Wn. App. 203, 204-05, 540 P.2d 480 (1975) (defendants cut hole in cyclone fence surrounding Puget Sound Power and Light compound; held, *Roadhs* applied, fence was a building).

pose was to protect the auto yard, making the fence a "building". *Brenner*, at 378.

In the instant case, both trial courts concluded that the primary purpose of this fence was to protect Pasado by keeping him confined within a defined area. There was substantial evidence at B.W.'s hearing and the trial of Lombardi and Gans to support the trial courts' determinations.[5] That there may have been other purposes for the fence does not undermine either trial court's determination. *Cf. Brenner*, 53 Wn. App. at 378 (where evidence supports finding that wrecking yard owner constructed fence to combat theft, irrelevant that fence also complies with state law requiring fence around wrecking yard for aesthetic reasons).

Appellants rely upon *State v. Flieger*, 45 Wn. App. 667, 671, 726 P.2d 1257 (1986). In *Flieger*, the defendant was charged with burglary for entering a backyard which was surrounded by a 6-foot fence. The homeowner told police that the gates and fence were closed to protect property stored in the backyard, including items in a shed. *Flieger*, 45 Wn. App. at 668. Despite this evidence, and noting that the fence could be opened from the exterior by reaching over and unlatching an unlocked gate, the court stated that this was a typical backyard fence, as might be found at any private residence. *Flieger*, at 671. As such, the court concluded that it did not amount to a "building", as its "main purpose" was not to protect property or "goods" inside. *Flieger*, at 671.

To the extent that *Flieger* stands for the proposition that a fence erected as a boundary or for beautification cannot be considered a "building" under the *Roadhs* main purpose test, we agree with the holding. *See Roadhs*, 71 Wn.2d at 708-09. However, to the extent that *Flieger* holds that an appellate court should decide the factual question of the primary purpose for a fence in each case, looking only at how tall or easily penetrated the fence may be, we decline to adopt its

---

[5]It was clear from the testimony at B.W.'s hearing that the primary purpose of this fence was to protect Pasado confined within the pasture, and to protect visitors to the farm from Pasado. At the trial of Lombardi and Gans, they stipulated as to the purposes of the fence: to keep Pasado in and visitors out, to prevent anyone from removing Pasado and to protect Pasado and visitors.

reasoning. We think a sounder approach is to allow the trier of fact to determine the primary purpose for a fence.

CONCLUSION

We conclude that, given the plain meaning of the term "goods", Pasado was "goods" deposited within the fenced area of his pasture. Thus, the burglary statute was applicable to the Appellants. Furthermore, the trial court in each of the cases presented in this appeal made a specific finding that the fence around Pasado's pasture had as its primary purpose the protection of Pasado. These findings are supported by substantial evidence.

Affirmed.

SCHOLFIELD and WEBSTER, JJ., concur.

Review denied at 126 Wn.2d 1020 (1995).