# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | DIVISION ONE |
| Respondent, | No. 83243-3-I |
| v. | |
| CHRISTOPHER MILES GATES, | UNPUBLISHED OPINION |
| Appellant. | |

DWYER, J. — Christopher Gates was found guilty by jury verdict of second degree intentional murder and second degree felony murder, both with a firearm enhancement, for the homicide of Robert Baker. Gates was also found guilty of unlawful possession of a firearm. In numerous pretrial motions, Gates sought to discharge his counsel. He additionally objected to multiple continuances granted by the trial court, although he frequently informed the court that he did not wish to proceed to trial at that time.

On appeal, Gates contends that government mismanagement resulted in delays proceeding to trial. He asserts that, pursuant to CrR 8.3(b), his murder conviction must be reversed and the charges against him dismissed due to the purported government mismanagement. We disagree. Washington's time-for-trial rule, set forth in CrR 3.3, governs the time limits within which criminal charges must be brought to trial. The rule provides that no case may be dismissed for time-to-trial reasons unless expressly required by the rule, by

statute, or by our state or federal constitution.  CrR 3.3(h).  Gates asserts neither a claim pursuant to CrR 3.3 nor a claim pursuant to a statute or constitutional provision.  Accordingly, he fails to assert a cognizable claim regarding the time within which his case was brought to trial.

In the alternative, Gates contends that he is entitled to a new trial on numerous grounds, including that the trial court erroneously admitted video evidence in violation of the privacy act, the trial court erroneously declined to instruct the jury regarding justifiable homicide in resistance of a felony, the prosecutor committed misconduct in closing argument, and the admission of his prior robbery conviction violated his right to testify and was improper pursuant to ER 609.  On all accounts, we disagree.  Gates has demonstrated neither trial court error nor prosecutorial misconduct that would entitle him to a new trial.  Nor do we find merit in the claims asserted by Gates in his statement of additional grounds.

We conclude, however, that Gates is entitled to relief on his final claim of error.  Gates asserts, and the State concedes, that the inclusion of the second degree felony murder conviction in the judgment and sentence violates the protection against double jeopardy.  We accept the State's concession and remand to the superior court to vacate the second degree felony murder conviction.  In all other respects, we affirm.

I

On May 2, 2018, the State charged Gates with premeditated murder in the first degree with a firearm allegation and unlawful possession of a firearm in the

2

first degree. The charges were premised on the April 22, 2018 shooting death of Robert Baker, which occurred outside of the Cedar Room nightclub in the Ballard neighborhood of Seattle. The State subsequently amended the information to add a charge of felony murder in the second degree with a firearm allegation.

An extended period during which Gates filed numerous pretrial motions ensued. As described by the presiding judge, the "constant theme" during this time was Gates's "dissatisf[action] with the attorneys who were appointed to represent him," notwithstanding that he "had really good attorneys on his case." Between September 2018 and September 2020, Gates filed "repeated motions either for a new lawyer or to represent himself" and "constantly complain[ed]" regarding his counsels' representation. Indeed, Gates filed at least seven motions to discharge counsel in one year alone.

In ruling on one such motion, in which Gates had asserted "irreconcilable conflict" with his counsel, the trial judge explained that he had "heard Mr. Gates repeatedly" and had concluded that the "irreconcilable differences . . . flow[ed] one way, and it's from Mr. Gates." The trial court denied the motion, ruling that Gates's attempt to "control the minutia of [the] case [had] led to [the] irreconcilable differences" and was "not a sufficient basis to grant new counsel." Gates also objected to multiple continuances granted by the trial court at defense counsel's request, although he frequently informed the trial court that he did not wish to proceed to trial at that time.

On September 4, 2020, defense counsel brought a motion to withdraw and substitute counsel. The managing attorney of the Society of Counsel

3

Representing Accused Persons explained to the court that Gates "[felt] very strongly that . . . he [had] not received effective assistance of counsel" and that a breakdown in communication with Gates had rendered counsel unable to present an adequate defense. The director of the Department of Public Defense similarly informed the court that the department was unable to provide effective representation due to a conflict resulting from Gates's repeated complaints regarding purported mismanagement.

The trial court granted the motion. In so doing, the court noted Gates's repeated motions to discharge counsel, which "universally, . . . [had] been denied." The court explicitly warned Gates that, "in the future," he would not be provided with representation at public expense if he continued to "engag[e] in a pattern of complaining or unwillingness to work with [his] lawyer." The court found that Gates's consistent complaints about his counsel were without merit.

New counsel was appointed on September 8, 2020. On March 26, 2021, Gates's counsel requested to delay trial until November 29, 2021. Gates submitted a declaration in support of the motion to continue. The trial court denied the motion and set a trial date of June 14, 2021.

Trial commenced for purposes of motions in limine on June 15, 2021. Gates moved to exclude video footage from an outward-facing dash-mounted camera on a rideshare vehicle that had captured footage of the incident resulting in the charges against him. The video footage was obtained from a vehicle driven by Chad Voorhis, who was working in his capacity as a Lyft driver on the date of the offense. Voorhis had picked up a passenger, Aaron Mitchell, in

4

Ballard. The recording includes audio of Voorhis and Mitchell engaging in conversation during the drive about "drinking with old friends," the air conditioning in the vehicle, and Voorhis's shifts as a rideshare driver. Shortly after Voorhis parked the vehicle to pick up additional passengers, the recording captured audio of gunshots and video of Gates shooting Baker across the public street.

The State offered into evidence "only the video recording of the shooting along with the sound of the gunshots," not "the audio of the conversation between [Mitchell] and [Voorhis] that occurred in the minutes leading up to the shooting." Gates sought to have the entirety of the recording, and also testimony by Voorhis, suppressed because, he asserted, the recording violated our state's privacy act, chapter 9.73 RCW. After reviewing both versions of the recording, the trial court ruled that the proffered evidence did not violate the privacy act and denied Gates's motion to suppress. The court determined that Mitchell "had no expectation of privacy in a Lyft vehicle," and that the three-minute and twelve-second conversation between Mitchell and Voorhis was not a "private conversation." The court noted that Mitchell and Voorhis were "complete strangers" and that their conversation was "innocuous and surface-level," not a "secret conversation." The court additionally ruled that "[a]lthough the audio recording of the inside of the vehicle and the video recording of the public street came from the same device, there is no connection between the conversation inside the Lyft [vehicle] and the events that were occurring out on a public street."

Gates additionally moved to suppress evidence of his August 2012 conviction of robbery in the first degree with a firearm. Alternatively, he

5

requested that the evidence be "sanitize[d]" and the State be ordered to refer to the incident solely as "conduct of theft." The State agreed to limit impeachment to the question of whether Gates had "been convicted of a crime of dishonesty." Pursuant to ER 609, the trial court denied Gates's motion to exclude the evidence. The court ruled that, in the event that Gates testified at trial, the State would be permitted to question him in the limited manner that it had proposed.

Seven days of witness testimony commenced on June 24, 2021. Gates testified that he, his girlfriend, and two friends were at the Cedar Room nightclub in Seattle's Ballard neighborhood in the early morning hours of April 22, 2018. After leaving the nightclub, they stood outside the back door on the sidewalk talking and "hanging out." Shortly thereafter, Gates's attention was redirected to "two guys that were apparently standing and looking at" him and his friends. The two individuals were Robert Baker and Adam Smith.

According to Gates, Smith stopped near the driver side of a vehicle while Baker walked toward the passenger side. Baker motioned to Smith to turn around to look toward Gates and his friends, which Smith quickly did. It then appeared to Gates that Smith grabbed something out of the vehicle. According to Gates, Baker then approached Smith on the driver side of the vehicle, and Smith passed something to Baker. Although Gates could not identify that the object was a weapon, he believed that it was. Baker then put the object in his right jacket pocket and began walking down the street in the direction of Gates and his friends. Gates testified that, during this time, Smith continued to closely

6

watch their group. Gates believed that Baker had a gun by the way he was holding his arm in his pocket, although Gates was unable to see any weapon.

Gates testified that Smith continued watching Gates and his friends as Baker proceeded down the street. According to Gates, he was afraid that the gun he believed Baker possessed would be used against him or one of his friends. When Baker reached a car parked on the other side of the street from Gates and his friends, Baker stopped walking. Gates testified that he "perceived [Baker] start to draw his arm out of his pocket." Gates then drew his own gun and fired "a few rounds" to the right of Baker. According to Gates, he fired these "deterrent shots" because he believed that Baker was about to fire on him. Gates testified that Baker then pulled out his own gun and aimed it across the street. Gates continued firing at Baker as Gates and his friends ran down the street. Baker died at the scene from a single gunshot wound to the right side of his chest.

Following trial testimony, defense counsel requested that the jury be provided with modified justifiable homicide jury instructions based on both criminal Washington Pattern Jury Instructions (WPIC) 16.02 and 16.03.[1] Gates argued that an instruction regarding justifiable homicide in resistance of a felony was appropriate because Baker "was attempting to commit a felony upon" Gates when Gates shot him. The trial court ruled that WPIC 16.02, the instruction regarding justifiable homicide in defense of self, reflected Gates's testimony that

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (4th ed. 2016) (WPIC).

he fired deterrent shots because he "was afraid that his friends or he would be injured or would be killed." The court explained that additionally providing the jury with WPIC 16.03, regarding justifiable homicide in resistance of a felony, "would unnecessarily confuse the jury." The court concluded that WPIC 16.02 "accurately reflect[ed] . . . the facts of this case and will allow [Gates] to argue [his] theory . . . and is an accurate reflection of the law." Thus, the trial court refused to provide the jury with the proposed modified WPIC 16.03 instruction.

Much of closing argument reflected Gates's self-defense theory of the case. Defense counsel urged the jury to consider Gates's life experiences in evaluating the reasonableness of his actions. In closing argument, counsel stated:

> A homicide is justifiable as is the case here when, specifically to the facts of this case, Mr. Gates had a reasonable belief that Mr. Baker intended to inflict death or great personal injury upon him. Mr. Gates reasonably believed that there was intent of such harm being accomplished, and Mr. Gates employed such force as a reasonably prudent person would under the same or similar conditions as they reasonably appeared to Mr. Gates taking into all – taking into consideration all the facts and circumstances as they appeared to Mr. Gates at the time, as they appeared to him.
>    You have to place yourself into the shoes of Mr. Gates, right? And knowing everything that he knew at that time in terms of observations of what conduct is going on and also taking into effect his personal experiences and his personal knowledge about how situations like this unfold; when you do so and you incorporate and include his observations, his knowledge, and his experience . . . it is clear that he was justified, that his use of force was reasonable, and that his assessments were correct.
>    . . . .
>    So how do you assess all the facts and circumstances as they appeared to Chris Gates? Different life experiences of people do not make one's heightened ability to and danger any less reasonable than those experiences of people who have not shared the same life experience as Christopher Gates, all right? We all

8

come from different places and we all bring different experiences into how we view situations. But looking at where Mr. Gates comes from and his experiences and his knowledge is how you have to view and assess was he reasonable in reaching the conclusions that he did.

In rebuttal, the prosecutor stated:

The problem with Defense's argument about self-defense is this. He wants different standards for different people. He wants you to look at Mr. Gates and look at Mr. Baker and look at Adam [Smith] and figure because they were up to something or because they are from a different background that they get a different law. Wow. Wow. That because of who they are, it's okay to just shoot somebody for walking down the street out the back of a club. It's okay to assume that they're armed when you didn't even see exactly what was handed. It's a different standard for Robert [Baker] and a different standard for the defendant because they're different. Wow. The law applies to everyone equally and the law says that you can't kill somebody because you think they have a gun.

On July 22, 2021, the jury acquitted Gates of murder in the first degree but returned a guilty verdict for the lesser included crime of intentional murder in the second degree. The jury also found Gates guilty of felony murder in the second degree. On both counts, the jury found that Gates was armed with a firearm when the offenses were committed. Gates was additionally found guilty of unlawful possession of a firearm in the first degree. In the judgment and sentence, the sentencing court listed both murder convictions in the findings but vacated the conviction of felony murder "for sentencing purposes only, in order to avoid multiple punishments for one criminal act." The court sentenced Gates to 300 months in prison.

Gates appeals.

9

II

Gates asserts that, pursuant to CrR 8.3(b), his convictions must be reversed and the charges against him dismissed because "government mismanagement forced [him] to waive his right to a speedy trial in order to obtain his right to counsel."[2] We disagree. As an initial matter, Gates cannot raise for the first time on appeal his rule-based claim of error. RAP 2.5(a). More significantly, Gates fails to raise a cognizable claim. The plain and unambiguous language of CrR 3.3 prohibits dismissal of criminal charges due to trial delay unless the defendant can demonstrate violation of the rule, a statute, or the state or federal constitution. Gates asserts no such claim. Accordingly, we reject his meritless assertion that he is entitled to the requested remedy.

Criminal Rule 3.3 governs time-to-trial requirements in Washington. The rule provides that when a charge is not brought to trial within the time limits set forth therein, that charge "shall be dismissed with prejudice." CrR 3.3(h). However, "this procedural right is not self-executing and requires that a motion be filed to exercise it in accordance with the procedure outlined in the rule." State v. Walker, 199 Wn.2d 796, 804, 513 P.3d 111 (2022). Pursuant to the rule, "[a] party who objects to the date set upon the ground that it is not within the time limits prescribed by this rule must, within 10 days after the notice is mailed or otherwise given, move that the court set a trial within those time limits." CrR

_____

[2] Br. of Appellant at 2.

10

3.3(d)(3).[3]  Significantly here, rule 3.3 provides that "[n]o case shall be dismissed for time-to-trial reasons *except as expressly required by this rule, a statute, or the state or federal constitution.*"  CrR 3.3(h) (emphasis added).

Our Supreme Court amended the time-for-trial rule in 2003 based on the recommendations of the Time-for-Trial Task Force.[4]  State v. Kone, 165 Wn. App. 420, 435, 266 P.3d 916 (2011).  The 2003 amendments include a provision regarding construction of the rule, which states:

> The allowable time for trial shall be computed in accordance with this rule.  If a trial is timely under the language of this rule, but was delayed by circumstances not addressed in this rule or CrR 4.1,[5] the pending charge *shall not be dismissed unless the defendant's constitutional right to a speedy trial was violated*.

CrR 3.3(a)(4) (emphasis added); see State v. George, 160 Wn.2d 727, 737, 158 P.3d 1169 (2007) (discussing identical amendments made to CrRLJ 3.3).

> In explaining the purpose of this provision, the Time-for-Trial Task Force stated:
>
> "Task force members are concerned that appellate court interpretation of the time-for-trial rules has at times expanded the rules by reading in new provisions. The task force believes that the rule, with the proposed revisions, covers the necessary range of time-for-trial issues, so that additional provisions do not need to be read in. Criminal cases should be dismissed under the time-for-trial rules only if one of the rules' express provisions have been violated; other time-for-trial issues should be analyzed under the speedy trial provisions of the state and federal constitutions."

George, 160 Wn.2d at 737 (quoting WASHINGTON COURTS TIME-FOR-TRIAL TASK

---

[3] "[O]nce the time-for-trial period has expired, a party cannot object to the untimely trial date under CrR 3.3(d)(3) because it is no longer reasonably possible to comply with the rule's requirement to 'object' in the prescribed manner, i.e., by moving to set the trial date within the time-for-trial period."  Walker, 199 Wn.2d at 802.

[4] The final report of the task force is available at https://www.courts.wa.gov/programs_orgs/pos_tft/.

[5] Criminal Rule 4.1 sets forth the requirements for time to arraignment.  CrR4.1(a).

FORCE, FINAL REPORT II.B at 12-13 (Oct. 2002) (on file with Admin. Office of Courts), *available at* http://www.courts.wa.gov/programs_orgs/pos_tft). The task force additionally recommended, and our Supreme Court adopted, the provision of the rule prohibiting dismissal of a case for time-to-trial reasons "except as expressly required by this rule, a statute, or the state or federal constitution." CrR 3.3(h).[6] Thus, "the task force concluded that a court should assume that a defendant is not entitled to dismissal with prejudice unless he or she establishes a violation of the expressed rules or the constitutional right to a speedy trial." George, 160 Wn.2d at 738.

Gates nevertheless contends that, due to trial delays resulting from purported government mismanagement in assigning his defense counsel, he is entitled to reversal of his convictions and dismissal of the charges against him. According to Gates, the alleged government mismanagement "forced [him] to waive his right to a speedy trial."[7] However, notwithstanding Gates's repeated references to his "right to a speedy trial" and "right to counsel," he nowhere asserts a constitutional claim of error.[8] Gates does not assert a speedy trial claim pursuant to either the Sixth Amendment or article I, section 22 of our state constitution. Moreover, he nowhere asserts that he was either completely deprived of counsel, see United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), or that his counsel was ineffective. See Strickland v.

---

[6] See WASHINGTON COURTS TIME-FOR-TRIAL TASK FORCE, FINAL REPORT III.A, *available at* https://www.courts.wa.gov/programs_orgs/pos_tft/report/pdf/CrR3.3.pdf.

[7] Br. of Appellant at 41.

[8] Gates's contention that he waived his right to a speedy trial is also factually inaccurate. No such waiver occurred.

12

Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Instead, Gates's claim of error is premised on CrR 8.3(b). This rule provides that "[t]he court, in furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." CrR 8.3(b). However, because Gates asserts a rule-based claim, this assertion of error may not be raised for the first time on appeal. RAP 2.5(a). See also Kone, 165 Wn. App. at 434 (defendant could not argue for the first time on appeal that the trial court should have granted his CrR 8.3(b) motion to dismiss due to purported CrR 3.3 time-to-trial violations); State v. Nowinski, 124 Wn. App. 617, 630, 102 P.3d 840 (2004) (holding that CrR 8.3(b) argument not presented to the trial could would not be considered as a basis for dismissal on appeal).

Additionally problematic is Gates's attempt to obtain reversal of his convictions and dismissal of the charges against him by characterizing a claim of error regarding trial delay as one of "government mismanagement." Indeed, we have previously rejected the assertion that dismissal of charges was warranted for purported government mismanagement prejudicing a defendant's so-called "right to a speedy trial" pursuant to CrR 3.3. Kone, 165 Wn. App. at 435-37. There, the defendant argued on appeal that the trial court should have granted his CrR 8.3(b) motion to dismiss for time-to-trial violations pursuant to CrR 3.3. Kone, 165 Wn. App. at 434-35. In addressing this contention, we looked to the

plain language of CrR 3.3(h).[9] Kone, 165 Wn. App. at 435. This "plain and unambiguous language," we concluded, "prohibits dismissal of a case under CrR 8.3(b) for violation of a defendant's time-to-trial rights under CrR 3.3 unless a defendant can show a violation of CrR 3.3, a statute, or the state or federal constitution." Kone, 165 Wn. App. at 436. Thus, we rejected the defendant's attempt to obtain dismissal pursuant to CrR 8.3(b) on the basis of a purported time-for-trial violation. Kone, 165 Wn. App. at 436-37. "CrR 3.3(b),"[10] we held, "provides the exclusive means to challenge a violation of the time-for-trial rule." Kone, 165 Wn. App. at 437.

Similarly, here, Gates attempts to characterize a time-to-trial claim of error as one of "government mismanagement" pursuant to CrR 8.3(b). However, a case may be dismissed for time-to-trial reasons only if such dismissal is "expressly required" by CrR 3.3, a statute, or the state or federal constitution. CrR 3.3(h). Although Gates's claim of error is premised on time-to-trial reasons, he nowhere asserts a violation of CrR 3.3, a statute, or the state or federal constitution. The plain and unambiguous language of CrR 3.3(h) precludes Gates from obtaining the relief requested pursuant to CrR 8.3(b). See Kone, 165 Wn. App. at 435-37. Accordingly, Gates has asserted no cognizable claim of error.

The judicial authority relied on by Gates, as it preceded our Supreme Court's 2003 amendments to the time-to-trial rule, is unavailing. See State v.

---

[9] Again, CrR 3.3(h) provides that "[n]o case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution."

[10] CrR 3.3(b) sets forth the time-for-trial requirements, which, when violated, are the basis for dismissal of a case pursuant to the rule.

14

Michielli, 132 Wn.2d 229, 937 P.2d 587 (1997); State v. Sherman, 59 Wn. App. 763, 801 P.2d 274 (1990). In Sherman, the trial court dismissed a criminal prosecution for theft pursuant to CrR 8.3(b) after the State failed to provide the defendant with records pertinent to the case. 59 Wn. App. at 765-67. We affirmed the dismissal of the charge, noting that "the speedy trial expiration date had been extended a total of seven times." Sherman, 59 Wn. App. at 769. Thus, we reasoned, to require the defendant to request a continuance to obtain the records "would be to present her with a Hobson's choice: she must sacrifice either her right to a speedy trial or her right to be represented by counsel who had sufficient opportunity to prepare her defense." Sherman, 59 Wn. App. at 769.

In Michielli, our Supreme Court held that dismissal of a criminal prosecution was warranted pursuant to CrR 8.3(b) when the State added new charges against the defendant "without any justification for the delay in amending the information." 132 Wn.2d at 245. Because defense counsel needed additional time to prepare to defend against the new charges, the court determined that the State's actions "forced [the defendant] either to go to trial unprepared, or give up his speedy trial right." Michielli, 132 Wn.2d at 245. The court held that "[t]he State's delay in amending the charges, coupled with the fact that the delay forced Defendant to waive his speedy trial right in order to prepare a defense, can reasonably be considered mismanagement and prejudice sufficient to satisfy CrR 8.3(b)." Michielli, 132 Wn.2d at 245.

Gates relies on this authority, however, without addressing our Supreme Court's subsequent amendment of the time-for-trial rule to include CrR 3.3(h). Because Gates fails to even address the pertinent rule, he nowhere asserts that Michielli and Sherman remain good law following the 2003 amendments. In any event, we have rejected such an argument concerning other decisional authority preceding the 2003 amendments to the rule. See State v. Thomas, 146 Wn. App. 568, 191 P.3d 913 (2008). In Thomas, we considered whether the amendments to CrR 3.3 superseded our Supreme Court's decision in State v. Fulps, 141 Wn.2d 663, 9 P.3d 832 (2000), in which the court relied on standards of the American Bar Association "to supplement CrR 3.3's speedy trial requirements" in determining the beginning date of a "speedy trial period." 146 Wn. App. at 570. We held that "the 2003 amendments to the time-for-trial rule supersede[d] the Fulps decision" and affirmed the superior court's reversal of the district court's dismissal of the criminal charge therein. Thomas, 146 Wn. App. at 570.

In determining whether decisional authority was superseded by the subsequent amendments, we considered the Time-for-Trial Task Force's explication of its concerns regarding prior interpretations of the rule:

> "Task Force members are concerned over the degree to which the time-for-trial standards have become less governed by the express language of the rule and more governed by judicial opinions. To address this concern, the task force has tried to fashion a rule that is simpler, has fewer ambiguities, and covers more of the field of time-for-trial issues, with the hope that a reader of the rule will have a better understanding of the overall picture than currently exists. The Task Force also recommends adopting a provision in CrR 3.3 expressly stating that the rule is intended to

16

cover all the reasons why a case should be dismissed under the rule. Courts should not read into the rule any other reasons beyond those that are expressly stated in the rule. Any other reasons should be analyzed under the corresponding constitutional provisions (Wash. Const. Art. I, § 22, and U.S. Const., Amend. 6)."

Thomas, 146 Wn. App. at 573 (quoting WASHINGTON COURTS TIME-FOR-TRIAL TASK FORCE, FINAL REPORT I(B)(1) at 6 (Oct. 2002) (on file with Admin. Office of the Courts), *available at* http://www.courts.wa.gov/programs_orgs/pos_tft). We concluded that, pursuant to the plain language of the amended rule, "dismissal is not a permissible remedy unless the defendant's constitutional right to a speedy trial is violated" if trial was delayed by circumstances not addressed in the rule itself. Thomas, 146 Wn. App. at 575. "Thus," we held, "the amended rule unambiguously prohibit[ed] the supplementation engaged in by the Fulps court." Thomas, 146 Wn. App. at 575-76.

Similarly, here, Gates relies on decisional authority that preceded the 2003 amendments to the time-to-trial rule. These decisions, because they preceded the adoption of CrR 3.3(h), permitted the dismissal of a criminal prosecution for time-to-trial reasons other than those "expressly required by [CrR 3.3], a statute, or the state or federal constitution." CrR 3.3(h). See Michielli, 132 Wn.2d 229; Sherman, 59 Wn. App. 763. As we held in Thomas, 146 Wn. App. at 575-76, such decisional authority is superseded by the court's amendment of the rule. Accordingly, the authority cited by Gates is unavailing.

Gates nowhere asserts that his trial was delayed due to a violation of CrR 3.3, a statute, or the state or federal constitution.[11] The plain and unambiguous

---

[11] Indeed, Gates insisted at oral argument that he was not asserting any such claim.

17

language of the time-to-trial rule prohibits the dismissal of criminal charges due to trial delay unless the defendant can demonstrate such a violation. CrR 3.3(h). Accordingly, Gates has failed to assert a cognizable claim of error. We thus reject his meritless assertion that he is entitled to reversal of his convictions and dismissal of the charges against him.

III

Gates next asserts that the trial court erred by admitting into evidence the recording from the rideshare vehicle that captured video footage of the shooting. According to Gates, the recording violated our state's privacy act and, thus, is inadmissible in any civil or criminal trial. We disagree. Because the recording included no "private conversation" pursuant to the act, the trial court did not err by admitting the proffered evidence.

Washington's privacy act, chapter 9.73 RCW, "is designed to protect private conversations from governmental intrusion." State v. Clark, 129 Wn.2d 211, 232, 916 P.2d 384 (1996). The act provides in pertinent part:

> Except as otherwise provided in this chapter, it shall be unlawful for any individual . . . to . . . record any:
>     . . . .
> [p]rivate conversation, by any device electronic or otherwise designed to record or transmit such conversation . . . without first obtaining the consent of all the persons engaged in the conversation.

RCW 9.73.030(1)(b). The privacy act mandates that "[a]ny information obtained in violation of RCW 9.73.030 . . . shall be inadmissible in any civil or criminal case." RCW 9.73.050. Additionally, and significantly, any person found to have

recorded a private conversation in violation of the act is liable for civil damages and is guilty of a gross misdemeanor. RCW 9.73.060, .080.

Gates asserts that the trial court erred by admitting into evidence the video recording of the shooting, along with the audio recording of the gunshots, which was obtained from the dash-mounted camera of the Lyft vehicle driven by Chad Voorhis on the night of the offense. According to Gates, the conversation between Voorhis and Aaron Mitchell, the Lyft passenger, was a "private conversation" pursuant to the privacy act. Thus, Gates contends, the evidence was improperly admitted at trial.[12] We disagree.

Washington's privacy act protects only "private" communication and conversation. RCW 9.73.030. "Private," as employed by the act, means "'belonging to one's self . . . secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private communication . . . secretly: not open or in public.'" Clark, 129 Wn.2d at 225 (alterations in original) (internal quotation marks omitted) (quoting Kadoranian v. Bellingham Police Dep't, 119 Wn.2d 178, 189-90, 829 P.2d 1061 (1992)). "A communication is private (1) when the parties manifest a subjective intention that it be private and (2) where that expectation is reasonable." State v. Kipp, 179 Wn.2d 718, 729, 317 P.3d 1029 (2014).

---

[12] Gates asserts that the proffered evidence was inadmissible, notwithstanding that it did not include any of the conversation between Voorhis and Mitchell, because RCW 9.73.050 provides that "[a]ny information obtained in violation of [the act]" is inadmissible. Because we conclude that the conversation between Voorhis and Mitchell was not a private conversation, we need not address this contention.

"Factors bearing on the reasonableness of the privacy expectation include the duration and subject matter of the communication, the location of the communication and the presence or potential presence of third parties, and the role of the nonconsenting party and his or her relationship to the consenting party." Kipp, 179 Wn.2d at 729. The reasonable expectation standard requires "a case-by-case consideration of all the surrounding facts." State v. Faford, 128 Wn.2d 476, 484, 910 P.2d 447 (1996). "[T]he presence or absence of any single factor is not conclusive for the analysis." Clark, 129 Wn.2d at 227. When, as here, the facts are undisputed, whether a conversation is "private" pursuant to the act is a matter of law we review de novo. Kipp, 179 Wn.2d at 728.

Consideration of the pertinent factors leads us to conclude that Mitchell had no reasonable expectation of privacy within the rideshare vehicle. The conversation between Voorhis and Mitchell lasted a mere three minutes and concerned the trivial subjects of "drinking with old friends," the air conditioning in the vehicle, and Voorhis's shifts as a rideshare driver. Such "'inconsequential, nonincriminating' conversations generally lack the expectation of privacy necessary to be protected under the act." Kipp, 179 Wn.2d at 730 (quoting Faford, 128 Wn.2d at 484).

The location of the conversation similarly indicates that it was not a "private conversation" within the meaning of the act. As our Supreme Court has held, "the ordinary person does not reasonably expect privacy in a stranger's car." Clark, 129 Wn.2d at 230. Such expectation is less reasonable still in a rideshare vehicle, in which the service of transporting persons for compensation

20

is provided.[13]  Indeed, as the trial court found, the Lyft vehicle driven by Voorhis had posted signs that audio and video recording was in progress, and the dash-mounted camera could be easily observed from within the vehicle.  That the conversation occurred in a rideshare vehicle indicates that Mitchell had no reasonable expectation of privacy.

Further demonstrating that the conversation between Voorhis and Mitchell was not private is the role of Mitchell, the "nonconsenting party" to the recording, and his relationship with Voorhis.  Mitchell was a passenger in Voorhis's rideshare vehicle, and the two were complete strangers.  A nonconsenting party's "willingness to impart the information to a stranger evidences that the communication is not private."  Kipp, 179 Wn.2d at 732 (holding that, in contrast, a conversation between brothers-in-law regarding a sensitive matter indicated a reasonable expectation of privacy).  See also Clark, 129 Wn.2d at 228 (concluding that the conversations there "were not private because they were routine conversations between strangers on the street concerning routine illegal drug sales").  For each of these reasons, we conclude that the conversation between Voorhis and Mitchell was not a "private conversation" subject to the exclusionary provision of the privacy act.

Moreover, when engaging in this analysis, we are cognizant that the privacy act creates criminal liability for those who unlawfully record private

---

[13] Indeed, our legislature has, in a separate statute, recognized as a "'place of public resort, accommodation, assemblage, or amusement' . . . any place . . . kept for . . . hire . . . where charges are made for . . . service," including "for public conveyance or transportation on land, water, or in the air."  RCW 49.60.040(2).  This evidences legislative recognition that rideshare vehicles, such as the one driven by Voorhis on the night of the offense, constitute public spaces.

conversation. See RCW 9.73.080(1) ("Except as otherwise provided in this chapter, any person who violates RCW 9.73.030 is guilty of a gross misdemeanor."). In discerning our legislature's intent, we consider the statutory scheme of the privacy act as a whole. See, e.g., Christensen v. Ellsworth, 162 Wn.2d 365, 373, 173 P.3d 228 (2007). Because our legislature criminalized violations of the privacy act, its applicability should be viewed as we view the applicability of criminal laws, to which we give a "literal and strict interpretation." State v. Delgado, 148 Wn.2d 723, 727, 63 P.3d 792 (2003). In asserting that the recording was required to be suppressed, Gates alleges that Voorhis, the rideshare driver, acted criminally by recording video and audio within his vehicle to promote his own safety and that of his passengers. Nowhere does the privacy act demonstrate an intent to criminalize such conduct.

The recording admitted into evidence included no content of the conversation between Voorhis and Mitchell that occurred in the minutes prior to the shooting. Gates nevertheless asserts that the evidence was improperly admitted because the complete version of the recording had been obtained in violation of the privacy act. The conversation between Voorhis and Mitchell, however, was not a "private conversation" pursuant to the act, as Mitchell had no reasonable expectation of privacy in the rideshare vehicle where the conversation occurred. Accordingly, the recording did not violate the privacy act, and the trial court properly admitted the proffered evidence.

IV

Gates next contends that the trial court erred by declining to instruct the jury on justifiable homicide in resistance of a felony. He asserts that he was denied due process due to this alleged error, thus necessitating reversal of his conviction. We disagree. The trial court's instructions to the jury, which included an instruction on justifiable homicide in defense of self, correctly stated the law and allowed Gates to argue his theory of the case. Because an additional instruction regarding justifiable homicide in resistance of a felony would have been repetitious, Gates was not entitled to such an instruction. Gates's related assertion that the State was relieved of its burden to disprove self-defense is also without merit. Accordingly, the trial court did not err by refusing to instruct the jury regarding justifiable homicide in resistance of a felony.

We review de novo a trial court's refusal to give a justifiable homicide instruction if the decision was based on a ruling of law. State v. Brightman, 155 Wn.2d 506, 519, 122 P.3d 150 (2005). If the court's decision was based on a factual dispute, we review the refusal to issue the instruction for an abuse of discretion. Brightman, 155 Wn.2d at 519.

Homicide is justifiable in Washington when committed either:

> (1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother, or sister, or of any other person in his or her presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; or

(2) In the actual resistance of an attempt to commit a felony upon the slayer, in his or her presence, or upon or in a dwelling, or other place of abode, in which he or she is.

RCW 9A.16.050.[14]

RCW 9A.16.050(1) contemplates justifiable homicide where the defendant reasonably fears the person slain is *about to* commit a felony upon the slayer or inflict death or great personal injury, and there is *imminent* danger that the felony or injury will be accomplished. In contrast, RCW 9A.16.050(2) considers a homicide justifiable where the defendant acted in *actual resistance* against an attempt to commit a felony on the slayer.

Brightman, 155 Wn.2d at 520-21 (citation omitted). "Thus, RCW 9A.16.050(2) addresses situations in which a felony or attempted felony is already in progress." Brightman, 155 Wn.2d at 521.

When a defendant has raised "some credible evidence . . . to establish that the killing occurred in circumstances that meet the requirements of RCW 9A.16.050," the defendant is entitled to an instruction on justifiable homicide. Brightman, 155 Wn.2d at 520. A defendant is not, however, entitled to repetitious instructions. State v. Bogdanov, No. 56202-2-II, slip op. at 12 (Wash. Ct. App. July 25, 2023), http://www.courts.wa.gov/opinions/pdf/562022.pdf (citing State v. Brenner, 53 Wn. App. 367, 377, 768 P.2d 509 (1989)); see also State v. Boisselle, 3 Wn. App. 2d 266, 291, 415 P.3d 621 (2018), rev'd on other grounds, 194 Wn.2d 1, 448 P.3d 19 (2019). "'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" State v.

---

[14] Our state's pattern jury instructions correspond to the sections of RCW 9A.16.050. See WPIC 16.02 ("Justifiable Homicide—Defense of Self and Others"); WPIC 16.03 ("Justifiable Homicide—Resistance to Felony").

Killingsworth, 166 Wn. App. 283, 288, 269 P.3d 1064 (2012) (internal quotation marks omitted) (quoting State v. Gerdts, 136 Wn. App. 720, 727, 150 P.3d 627 (2007)).

Here, the trial court instructed the jury regarding justifiable homicide in self-defense. The court determined that this instruction would allow Gates to argue his theory of the case, based on Gates's testimony that he fired at Baker "because he was afraid that his friends or he would be injured or would be killed." However, the court refused to provide to the jury Gates's proposed modified instruction regarding justifiable homicide in resistance of a felony, concluding that the instruction would "unnecessarily confuse the jury" given the testimony at trial. Gates asserts that the trial court erred by refusing to instruct the jury regarding justifiable homicide as defined in RCW 9A.16.050(2). We disagree.

Gates testified at trial that he believed that Baker possessed a gun and that he was afraid that the weapon would be used against him or his friends. In closing, defense counsel argued that the homicide was justifiable because "[w]hen someone is *about to* commit a felony upon you, when they are *about to* assault you with a firearm," a response such as that carried out by Gates is reasonable. (Emphasis added.) Counsel further argued in closing that Gates's conduct was justifiable because Baker was "intending to commit an assault" against him and his friends.

The trial court instructed the jury:

> It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.

25

> Homicide is justifiable when committed in the lawful defense of the slayer or any person in the slayer's presence or company when:
>
> (1) the slayer reasonably believed that the person slain or others whom the defendant reasonably believed were acting in concert with the person slain intended to inflict death or great personal injury;
>
> (2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and
>
> (3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

Instruction 25 (WPIC 16.02).

This instruction was a correct statement of the law that allowed Gates to argue his theory of the case. As our Supreme Court articulated in Brightman, "RCW 9A.16.050(1) contemplates justifiable homicide where the defendant reasonably fears the person slain is *about to* commit a felony upon the slayer or inflict death or great personal injury, and there is *imminent* danger that the felony or injury will be accomplished." 155 Wn.2d at 520-21. Both Gates's testimony and closing argument were premised on his alleged apprehension that Baker intended to inflict harm on Gates and his friends and that the infliction of such harm was imminent. Thus, the instruction provided to the jury allowed Gates to fully argue this theory of the case. See Bogdanov, No. 56202-2-II, slip op. at 13-14.

Moreover, an additional instruction regarding justifiable homicide in resistance of a felony would have been repetitious. In Brenner, we determined that the defendant was not entitled to an instruction regarding justifiable homicide in resistance of a felony when the self-defense instruction provided to the jury

permitted the defendant to argue his theory of the case. 53 Wn. App. at 376.
We held that "[b]ecause justifiable homicide is limited to felonies where the attack
on the defendant's person threatens life or great bodily harm," the proposed
instruction "simply repeat[ed] the substance" of the self-defense instruction
provided to the jury. Brenner, 53 Wn. App. at 377. Similarly, in Boisselle, we
held that an instruction regarding justifiable homicide in resistance of a felony
would have been repetitious when the defendant "was already arguing that he
was resisting death or great bodily harm" pursuant to RCW 9A.16.050(1). 3 Wn.
App. 2d at 291. The same is true here. Gates argued that the homicide he
committed was justified because he reasonably feared that Baker was about to
do harm to him or his friends. Given Gates's theory of the case, the proposed
instruction would have been repetitious. "A defendant is not entitled to
repetitious instructions." Bogdanov, No. 56202-2-II, slip op. at 12. Moreover,
because the trial court instructed the jury regarding justifiable homicide in
defense of self, the State was not relieved of its burden to disprove self-defense.

Gates nevertheless asserts that the trial court's refusal to instruct the jury
regarding justifiable homicide in resistance of a felony is inconsistent with
decisional authority. We disagree. Contrary to Gates's assertion, our Supreme
Court's decision in Brightman, 155 Wn.2d 506, does not hold that a defendant is
entitled to such an instruction when that instruction would be duplicative of the
self-defense instruction provided to the jury. Rather, there, the defendant
asserted that, to be entitled to an instruction regarding RCW 9A.16.050(2), he
was not required to show fear of great bodily harm or death if he acted in actual

defense of an attempted felony. Brightman, 155 Wn.2d at 519. Our Supreme Court rejected the argument, holding that "a justifiable homicide instruction based on *either* .050(1) or .050(2) depends upon a showing that the use of deadly force was *necessary under the circumstances*." Brightman, 155 Wn.2d at 523.

Gates's reliance on other decisional authority is similarly misplaced. See State v. Brown, 21 Wn. App. 2d 541, 506 P.3d 1258, review denied, 199 Wn.2d 1029 (2022); State v. Ackerman, 11 Wn. App. 2d 304, 453 P.3d 749 (2019). In Ackerman, the trial court instructed the jury regarding both RCW 9A.16.050(1) and .050(2), but the court altered the language of the resistance of a felony instruction to state that homicide was justifiable if the defendant acted in resistance of a "'violent felony.'" 11 Wn. App. 2d at 311-12. The court did not instruct the jury that robbery—the offense that the defendant allegedly acted in resistance of—constituted such a felony. Ackerman, 11 Wn. App. 2d at 313. We held that "[b]y suggesting that a robbery may not satisfy the requirements of a justifiable homicide defense," the instructions "diluted the State's burden of proving the absence of self-defense beyond a reasonable doubt." Ackerman, 11 Wn. App. 2d at 313.

In Brown, both defense counsel and the State proposed instructions on justifiable homicide in self-defense and in resistance of a felony. 21 Wn. App. 2d at 560. On appeal, the defendant asserted that she received ineffective assistance of counsel because the instruction provided to the jury regarding RCW 9A.16.050(2) misstated the law by indicating that homicide was justifiable only if the slayer possessed a reasonable fear of great personal danger. Brown,

21 Wn. App. 2d at 561. Division Three held that the instruction provided to the jury properly stated the law because RCW 9A.16.050(2) "require[s] the slayer to reasonably fear great personal injury before using deadly force." Brown, 21 Wn. App. 2d at 564 (citing Brightman, 155 Wn.2d at 520-22). Neither decision suggests that the trial court erred here.

A defendant is entitled to a justifiable homicide instruction when some credible evidence indicates that the homicide occurred in circumstances that meet the requirements of RCW 9A.16.050. Brightman, 155 Wn.2d at 520. However, a defendant is not entitled to repetitious jury instructions. Bogdanov, No. 56202-2-II, slip op. at 12; Boisselle, 3 Wn. App. 2d at 291; Brenner, 53 Wn. App. at 377. Here, the instruction provided to the jury properly stated the law and permitted Gates to argue his theory of the case—that the homicide was justifiable because he reasonably feared that Baker intended to harm him or his friends. Moreover, because the trial court instructed the jury regarding justifiable homicide in defense of self or others, the State was not relieved of its burden to disprove self-defense. The proposed instruction would have been repetitious. Accordingly, the trial court did not err by refusing to so instruct the jury.

V

Gates further asserts that he was denied a fair trial due to prosecutorial misconduct. Specifically, he contends that the prosecutor's comments in closing argument minimized and shifted the burden of proof, denigrated defense counsel, mischaracterized the law, and falsely implied that the defense argument was racist. We disagree. The prosecutor accurately described the reasonable

doubt standard, neither minimizing nor shifting the State's burden of proof. Moreover, the prosecutor's remarks in rebuttal closing argument were made in response to defense counsel's invitation to the jury to consider the reasonableness of Gates's conduct from a purely subjective standpoint. The prosecutor's remarks accurately portrayed the objective component of the self-defense standard and neither denigrated defense counsel nor implied that defense counsel's closing argument was racist.

"Prosecutorial misconduct may deprive a defendant of his right to a fair trial." State v. Evans, 163 Wn. App. 635, 642, 260 P.3d 934 (2011). "We review a prosecuting attorney's allegedly improper remarks in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). In order to establish that a prosecutor's remarks constituted misconduct, the defendant must demonstrate both that the comments were improper and that prejudice resulted. Anderson, 153 Wn. App. at 427. "If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). When, as here, the defendant did not object at trial to the allegedly improper remarks, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. "In other words, a conviction must be reversed only if there is a substantial likelihood

that the alleged prosecutorial misconduct affected the verdict." State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

A

Gates first asserts that the prosecutor committed misconduct by minimizing and shifting the burden of proof. In closing argument, the prosecutor stated:

> The most important principle in our justice system is that in a criminal case, the State has the burden to prove beyond a reasonable doubt every element of every crime.
> . . . .
> This is a high burden, the highest burden, but it is not an impossible burden. It is not an unusual burden. It is the burden that must be met for every criminal conviction.

The prosecutor further stated to the jury:

> Reason must inform your doubt. If you have a doubt, it must be for a reason. Likewise, if you believe that something is proven, it must be for a reason.

"Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." State v. Lindsay, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). Accordingly, statements by the prosecutor suggesting that the jury must convict unless they can articulate a reason to do otherwise are improper. Emery, 174 Wn.2d at 760; Evans, 163 Wn. App. at 645-46; State v. Johnson, 158 Wn. App. 677, 684-86, 243 P.3d 936 (2010); State v. Venegas, 155 Wn. App. 507, 523-25, 228 P.3d 813 (2010); Anderson, 153 Wn. App. at 429-32. Such arguments imply "that the jury must be able to articulate its reasonable doubt by filling in the blank." Emery, 174 Wn.2d at 760. "This suggestion is inappropriate because the State bears the

31

burden of proving its case beyond a reasonable doubt, and the defendant bears no burden. By suggesting otherwise, the State's 'fill in the blank' argument subtly shifts the burden to the defense." Emery, 174 Wn.2d at 760 (citations omitted). Thus, in Emery, the court found improper the prosecutor's closing statement to the jury that

> "in order for you to find the defendant not guilty, you have to ask yourselves or you'd have to say, quote, I doubt the defendant is guilty, and my reason is blank. A doubt for which a reason exists. If you think that you have a doubt, you must fill in that blank."

Emery, 174 Wn.2d at 750-51. However, the court found no fault with the prosecutor's description to the jury of "reasonable doubt as a 'doubt for which a reason exists,'" which the court concluded "properly describe[d]" the reasonable doubt standard. Emery, 174 Wn.2d at 760.

Here, the prosecutor did not suggest to the jury that it must convict Gates unless it could "articulate its reasonable doubt by filling in the blank." Emery, 174 Wn.2d at 760. Rather, consistent with the trial court's instructions to the jury,[15] the prosecutor told the jurors that, "If you have a doubt, it must be for a reason." This statement "properly describes" the reasonable doubt standard. Emery, 174 Wn.2d at 760; see also Anderson, 153 Wn. App. at 430 (holding that "[t]he prosecutor's statements that a 'reasonable doubt' is one for which a reason exists were . . . not inaccurate," and noting that "the trial court's instructions to the jury only reiterated this concept"). Accordingly, contrary to Gates's contention,

---

[15] The trial court instructed the jury: "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence." (Jury Instruction 3).

the prosecutor's statement did not improperly shift the burden of proof to the defense.

Gates additionally asserts that the prosecutor improperly "equated what the jury must do to *acquit* with what the jury must do to *convict*"[16] by stating to the jury: "If you have a doubt, it must be for a reason. Likewise, if you believe that something is proven, it must be for a reason." We disagree. This statement, rather than relieving the State of its burden, accurately described the reasonable doubt standard and informed the jury that it must also have a reason in order to conclude that the State proved the elements of the offense. Moreover, the prosecutor additionally informed the jury that "the State has the burden to prove beyond a reasonable doubt every element of every crime," which the prosecutor described as "[t]he most important principle in our justice system." The prosecutor further described the State's burden as "the highest burden." The remarks challenged by Gates must be considered in the context of the prosecutor's entire argument. Anderson, 153 Wn. App. at 427. Because these statements neither minimized nor shifted the State's burden of proof, they do not constitute prosecutorial misconduct.

B

Gates additionally contends that the prosecutor committed misconduct in rebuttal closing argument "by misstating the law, denigrating defense counsel, and falsely implying the defense argument was racist."[17] Again, we disagree.

---

[16] Br. of Appellant at 81.
[17] Br. of Appellant at 84.

The challenged remarks neither denigrated defense counsel nor suggested that defense counsel's closing argument was racist. Rather, the prosecutor's remarks, which accurately described the objective component of the reasonableness standard, were made in response to defense counsel's invitation to the jury to consider the reasonableness of Gates's conduct from a purely subjective standpoint. We conclude that, in this context, the prosecutor's remarks do not constitute misconduct.

"A prosecuting attorney commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). Additionally, although a prosecutor "can certainly argue that the evidence does not support the defense theory," the prosecutor "must not impugn the role or integrity of defense counsel." Lindsay, 180 Wn.2d at 431-32. "Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." Lindsay, 180 Wn.2d at 432. Nevertheless, the prosecuting attorney has "wide latitude" in closing argument "to argue reasonable inferences from the evidence." State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). "Remarks of the prosecutor, even if they are improper, are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." Russell, 125 Wn.2d at 86.

Here, in closing argument, defense counsel urged the jury to consider Gates's life experiences in evaluating the reasonableness of his conduct. Defense counsel stated:

A homicide is justifiable as is the case here when, specifically to the facts of this case, Mr. Gates had a reasonable belief that Mr. Baker intended to inflict death or great personal injury upon him. Mr. Gates reasonably believed that there was intent of such harm being accomplished, and Mr. Gates employed such force as a reasonably prudent person would under the same or similar conditions as they reasonably appeared to Mr. Gates taking into all – taking into consideration all the facts and circumstances as they appeared to Mr. Gates at the time, as they appeared to him.

You have to place yourself into the shoes of Mr. Gates, right? And knowing everything that he knew at that time in terms of observations of what conduct is going on and also taking into effect his personal experiences and his personal knowledge about how situations like this unfold; when you do so and you incorporate and include his observations, his knowledge, and his experience in those two minutes [when the shooting occurred], . . . it is clear that he was justified, that his use of force was reasonable, and that his assessments were correct.

. . . .

So how do you assess all the facts and circumstances as they appeared to Chris Gates? Different life experiences of people do not make one's heightened ability to and danger any less reasonable than those experiences of people who have not shared the same life experience as Christopher Gates, all right? We all come from different places and we all bring different experiences into how we view situations. But looking at where Mr. Gates comes from and his experiences and his knowledge is how you have to view and assess was he reasonable in reaching the conclusions that he did. He has spoken to you . . . about how he has been at nightclubs and he has seen things occur at nightclubs that create a very unsafe environment. He has told you that he has had a cousin that was killed, he had a friend . . . that was killed, and he's been shot at himself. These are experiences that engrain themselves in you so that when you are in certain positions or at certain places that you are unfamiliar with or may not know the people, it shapes the way that you perceive what's out there. And people that don't have the life experience and knowledge that Christopher Gates has, they can walk into the Cedar Room and everything to them is going to seem real happy-go-lucky, right? There's no threats that

35

exist.  But not everyone comes from the . . . same background, and so those experiences lead to the appearance of the observed conduct, right?

But, nonetheless, you have to take into consideration that experience and that knowledge that he has in assessing – whether his assessment of the threat was reasonable.  And it may be difficult to fully grasp that witnessing such conduct and having such experience and knowledge can occur, but it is actually quite more common tha[n] you might expect.  And how do we know this?  Because we know from the evidence in this case, right?  Those shared experiences amongst the parties in this case are why Adam Smith had a gun in the first place.  Those shared life experiences are why Adam Smith took the gun into the club himself.  He told you I was afraid.  He didn't say . . . that there was any person that he was afraid of per se.  He said he was afraid and that's why he brought the gun in with him.

Those shared experiences are why Adam Smith was shot the week before and suffered a potentially mortal injury, but for the grace of his telephone in his pocket according to his testimony.  Those shared experiences are why Robert Baker armed himself with Adam Smith's gun at the car on April 22nd.  Those shared experiences are why Christopher Gates took a gun to the club.  Those shared experiences are why so many people have lost friends and loved ones because it is a lot more common, the threat and the danger does exist out there, and just because you may not have the life experience or the personal knowledge to see it when it is occurring does not mean that it is not occurring right before your very face.

. . . .

. . . So these are widespread experiences, and these experiences exist among many many people and they are reasonable experiences in order to assess situations, and that's what was happening at the Cedar Room on April 22nd.

The prosecutor, in rebuttal, stated:

The problem with Defense's argument about self-defense is this.  He wants different standards for different people.  He wants you to look at Mr. Gates and look at Mr. Baker and look at Adam [Smith] and figure because they were up to something or because they are from a different background that they get a different law.  Wow.  Wow.  That because of who they are, it's okay to just shoot somebody for walking down the street out the back of a club.  It's okay to assume that they're armed when you didn't even see exactly what was handed.  It's a different standard for Robert [Baker] and a different standard for the defendant because they're

36

different.  Wow.  The law applies to everyone equally and the law says that you can't kill somebody because you think they have a gun.

Gates first asserts that the prosecutor committed misconduct in rebuttal closing argument by misstating the law of self-defense.  According to Gates, the prosecutor "falsely told the jury that [Gates's] explanation [in closing argument] was wrong."[18]  We disagree.  The reasonableness standard of self-defense incorporates both subjective and objective components.  In closing argument, defense counsel encouraged the jury to evaluate the reasonableness of Gates's conduct based on his personal life experiences.  In rebuttal, the prosecutor accurately, though perhaps unartfully, explained to the jury that the reasonableness standard also requires an objective inquiry.  These comments, made in response to defense counsel's closing argument, do not constitute misconduct.

"The longstanding rule in [Washington] is that evidence of self-defense must be assessed from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees."  State v. Janes, 121 Wn.2d 220, 238, 850 P.2d 495 (1993) (citing State v. Allery, 101 Wn.2d 591, 594, 682 P.2d 312 (1984)).  This approach to reasonableness "incorporates both subjective and objective characteristics."  Janes, 121 Wn.2d at 238.  "It is subjective in that the jury is 'entitled to stand as nearly as practicable in the shoes of [the] defendant, and from this point of view determine the character of the act.'"  Janes, 121 Wn.2d at 238 (alteration in original) (quoting

---

[18] Br. of Appellant at 90.

State v. Wanrow, 88 Wn.2d 221, 235, 559 P.2d 548 (1977)).  "The self-defense evaluation is objective in that the jury is to use this information in determining 'what a reasonably prudent [person] similarly situated would have done.'"  Janes, 121 Wn.2d at 238 (alteration in original) (quoting Wanrow, 88 Wn.2d at 236).

Our Supreme Court has articulated the significance of each component of the reasonableness standard.  "The subjective aspects," the court has explained, "ensure that the jury fully understands the totality of the defendant's actions from the defendant's own perspective."  Janes, 121 Wn.2d at 239.  On the other hand, the objective component of the inquiry

> serves the crucial function of providing an external standard. Without it, a jury would be forced to evaluate the defendant's actions in the vacuum of the defendant's own subjective perceptions.  In essence, self-defense would always justify homicide so long as the defendant was true to his or her own internal beliefs.

Janes, 121 Wn.2d at 239.

The court then cautioned against the consequence of a fully subjective reasonableness standard:

> "[I]f the reasonable person has all of the defender's characteristics, the standard loses any normative component and becomes entirely subjective.  Applying a purely subjective standard in all cases would give free rein to the short-tempered, the pugnacious, and the foolhardy who see threats of harm where the rest of us would not and who blind themselves to opportunities for escape that seem plainly available.  These unreasonable people may not be as wicked as (although perhaps more dangerous than) cold-blooded murderers . . . but neither are they, in practical or legal terms, justified in causing death."

Janes, 121 Wn.2d at 240 (alterations in original) (quoting Susan R. Estrich, *Defending Women*, 88 MICH. L. REV. 1430, 1435 (1990)).

Defense counsel in closing argument told the jurors that "looking at where Mr. Gates comes from and his experiences and his knowledge is how you have to view and assess was he reasonable in reaching the conclusions that he did." Counsel then referenced Gates's testimony that he had observed unsafe situations at nightclubs, that his cousin and friend had been killed, and that Gates himself had "been shot at." Such experiences, defense counsel told the jury, "shape[] the way you perceive what's out there." Counsel suggested that Gates's "heightened ability" to perceive danger due to his "life experiences" did not make his experiences "any less reasonable than those experiences" of others. Defense counsel told the jury that Gates's experiences are "widespread" and "they are reasonable experiences in order to assess situations." In essence, defense counsel argued that, given Gates's life experiences and alleged "heightened ability" to perceive danger, Gates acted reasonably in shooting Baker, even if people with different life experiences would have been unreasonable in so doing.

In rebuttal, the prosecutor stated that Gates was requesting "different standards for different people." She informed the jury that "[t]he law applies to everyone equally and the law says that you can't kill somebody because you think they have a gun." The prosecutor's remarks, although perhaps unartful, were in response to defense counsel's suggestion that the reasonableness of Gates's conduct should be evaluated based solely on his subjective experience. The remarks conveyed that, if the reasonableness standard was solely subjective, the standard would lose any external normative component and, thus,

a different standard could be applied to every defendant based on his or her own subjective experiences. These remarks were an accurate portrayal of the law. See Janes, 121 Wn.2d at 239 (discussing the subjective and objective components of the reasonableness standard). The question is not whether Gates's conduct was reasonable based on his own subjective beliefs, as suggested by defense counsel. Rather, the question is whether a "reasonably prudent person, knowing all [that Gates knew] and seeing all [that Gates saw]," would have shot Baker. Janes, 121 Wn.2d at 238. Contrary to Gates's contention, the prosecutor did not misstate the law of self-defense.[19]

Nor did the prosecutor's remarks in rebuttal malign defense counsel or suggest that defense counsel's closing argument was racist. Prosecutorial comments indicating that defense counsel's case presentation was "'a crock'" or involved "'sleight of hand'" impugn defense counsel's integrity and, thus, constitute misconduct. Lindsay, 180 Wn.2d at 433-34; Thorgerson, 172 Wn.2d at 451-52. No such comments were made here. Moreover, contrary to Gates's suggestion, the prosecutor's remarks did not imply that defense counsel was seeking a different standard because Gates is a Black man. Rather, the prosecutor's argument was that the reasonableness standard is not solely subjective and that, were it so, a defendant's life experiences would create a

_____

[19] We also express our disagreement with an argument that found its way into Gates's reply brief on appeal. Therein, Gates asserted that implicit in the prosecutor's remarks "is the assumption that the objective 'reasonable person' standard means a middle-aged white person with experiences in privileged white communities." Reply Br. of Appellant at 37. This is not so. That the reasonableness standard includes an objective component does not implicate the subjective experience of a "middle-aged white person" any more than it implicates Gates's own life experiences.

"different standard" for justifiable homicide.[20]

The prosecutor in closing argument accurately described the reasonable doubt standard without either minimizing or shifting the State's burden of proof. The prosecutor's remarks in rebuttal closing argument, which were made in response to defense counsel's portrayal of the reasonableness standard as purely subjective, accurately portrayed the objective component of that standard. The remarks neither denigrated defense counsel nor implied that counsel's closing argument was racist. The prosecutor did not commit misconduct, and Gates was not denied a fair trial.

VI

Gates also contends that the admission of evidence of his prior robbery conviction violated his constitutional right "to appear and defend in person" and "to testify in his own behalf," WASH. CONST. art. I, § 22, and was improper pursuant to ER 609(a)(2). We disagree. As Gates acknowledges, our Supreme Court has previously rejected similar claims of error. Accordingly, the trial court did not err by admitting evidence of Gates's prior robbery conviction.

It is well established in Washington that evidence of crimes of dishonesty, including theft and robbery, is per se admissible at trial for purposes of

---

[20] For these same reasons, we reject Gates's assertion that our Supreme Court's decision in State v. Zamora, 199 Wn.2d 698, 512 P.3d 512 (2022), requires reversal of his convictions. The prosecutor's remarks could not be viewed by an objective observer as an appeal to the jurors' potential prejudice, bias, or stereotypes. See Zamora, 199 Wn.2d at 718. Rather, as we have discussed, the remarks implicated the dual nature of the reasonableness standard. See Zamora, 199 Wn.2d at 718-19 (holding that the pertinent inquiry requires the court to consider "the apparent purpose of the statements, whether the comments were based on evidence or reasonable inferences in the record, and the frequency of the remarks").

impeachment pursuant to ER 609(a)(2).[21]  State v. Rivers, 129 Wn.2d 697, 705, 921 P.2d 495 (1996); State v. Ray, 116 Wn.2d 531, 545, 806 P.2d 1220 (1991); State v. Brown, 113 Wn.2d 520, 552-53, 782 P.2d 1013, 787 P.2d 906 (1989). The admission of such evidence, our Supreme Court has concluded, does not impermissibly interfere with a defendant's right to testify in his or her own behalf. State v. Ruzicka, 89 Wn.2d 217, 232-35, 570 P.2d 1208 (1977).  In Ruzicka, the defendant asserted that a statute permitting the introduction of prior conviction evidence for impeachment purposes was "unconstitutional as permitting the prosecutor to impose a penalty on the defendant for exercising his constitutional right to testify on his own behalf." 89 Wn.2d at 232.  Our Supreme Court disagreed:

> Not all burdens placed on the defendant's choice of whether to testify constitute impermissible penalties on his exercising his constitutional right to testify on his own behalf.  For example, the police may obtain a statement from the defendant which violates his Miranda[22] rights.  Although his statement cannot be introduced in the prosecutor's case-in-chief, if the defendant chooses to testify the prosecutor can use the defendant's statement for impeachment purposes.  In deciding whether to testify, the defendant must weigh the pros and cons of perhaps having his previously inadmissible statement heard by the jury.  This procedure is not thought to be inconsistent with the defendant's right to testify.

Ruzicka, 89 Wn.2d at 233-34 (citations and footnotes omitted).

---

[21] Evidence Rule 609 provides:
For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by the public record during examination of the witness but only if the crime (1) was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered, or (2) involved dishonesty or false statement, regardless of the punishment.
[22] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

In <u>Brown</u>, the court similarly rejected the assertion that ER 609 must be narrowly construed in order to avoid a "Hobson's choice" in which the defendant "faced with prior conviction evidence" must "either refuse to testify and lose any benefit of presenting his or her side of the story as is the defendant's right, or testify and risk the effect of the inherent prejudice associated with prior conviction evidence." 113 Wn.2d at 553. There, the court explained that

> as hard as this choice may be for a defendant, requiring such choices is not inconsistent with the criminal process . . . . Further, we do not lose sight of the principle that a defendant has no right to testify free of impeachment, and that the purpose of ER 609(a)(2) is to permit admission of evidence affecting the credibility of the witness. Society has an interest here in evaluating the credibility of defendants with criminal convictions affecting their credibility and in preventing a defendant with a criminal past from presenting himself or herself as an "innocent among thieves."

<u>Brown</u>, 113 Wn.2d at 553-54.

Gates nevertheless contends that robbery is not a crime of dishonesty and, thus, that the admission of his robbery convictions was erroneous under a proper reading of ER 609(a)(2). He further contends that admission of the prior conviction evidence impermissibly interfered with his right to testify in his own behalf pursuant to article I, section 22. Gates acknowledges, however, that his arguments are foreclosed by our Supreme Court's decisional authority. Because that authority "is binding on all lower courts until it is overruled," <u>State v. Gore</u>, 101 Wn.2d 481, 487, 681 P.2d 227 (1984), Gates does not establish an entitlement to appellate relief on these claims.

43

VII

Gates further asserts that his right to be free from double jeopardy was violated by the inclusion in his judgment and sentence of convictions of both second degree intentional murder and second degree felony murder. The State concedes that the felony murder conviction must be vacated. We agree and accept the State's concession. Accordingly, we remand to the trial court for entry of an order vacating the second degree felony murder conviction and amending the judgment and sentence to remove reference to that conviction.

Both our federal and state constitutions protect persons from being twice put in jeopardy for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. In addition to prohibiting a second prosecution for the same offense after acquittal or conviction, the protection against double jeopardy also prohibits the imposition of multiple punishments for the same criminal conduct. State v. Linton, 156 Wn.2d 777, 783, 132 P.3d 127 (2006). "The term 'punishment' encompasses more than just a defendant's sentence for purposes of double jeopardy." State v. Turner, 169 Wn.2d 448, 454, 238 P.3d 461 (2010) (citing State v. Womac, 160 Wn.2d 643, 656-58, 160 P.3d 40 (2007)). "Indeed, even a conviction alone, without an accompanying sentence, can constitute 'punishment' sufficient to trigger double jeopardy protections." Turner, 169 Wn.2d at 454-55. Thus, double jeopardy may be violated "*either* by reducing to judgment both the greater and the lesser of two convictions for the same offense *or* by conditionally vacating the lesser conviction while directing, in some form or another, that the conviction nonetheless remains valid." Turner, 169 Wn.2d at 464; see also

<u>Womac</u>, 160 Wn.2d at 647, 660 (holding that additional convictions premised on the same facts must be vacated, even when the trial court imposed sentence on only one of the convictions). "To assure that double jeopardy proscriptions are carefully observed, a judgment and sentence must not include any reference to the vacated conviction." <u>Turner</u>, 169 Wn.2d at 464.

Here, Gates was convicted of both second degree intentional murder and second degree felony murder for his conduct resulting in the death of Baker. The felony judgment and sentence includes both of the convictions, but it indicates that the felony murder conviction was vacated "for sentencing purposes only, in order to avoid multiple punishments for one criminal act." The State concedes that the inclusion of the felony murder conviction in the judgment and sentence violates double jeopardy protections. We accept the State's concession and remand to the trial court for entry of an order vacating the second degree felony murder conviction and amending the judgment and sentence to remove any reference to that conviction.[23]

---

[23] Gates raises numerous additional claims of error in his statement of additional grounds, including that (1) the trial court erroneously denied his motion to suppress search warrants, (2) the trial court erred by allowing the State to amend the information on the first day of trial, (3) the trial court improperly excluded evidence relevant to his perceptions while committing the offense by sustaining hearsay objections, (4) the trial court erroneously admitted into evidence text messages from the days following the offense, (5) the trial court erred by granting the State's request for a first aggressor jury instruction, (6) the trial court erroneously granted the State's request for an instruction on the lesser included offense of intentional murder in the second degree, (7) the trial court provided to the jury an erroneous to-convict instruction for felony murder in the second degree, (8) the State engaged in misconduct that violated his right to a fair trial when the prosecution (a) allegedly appealed to racial bias in referencing the lack of remorse and the use of language in Gates's text messages and in questioning Gates's decision to visit the nightclub outside of which the incident occurred and (b) allegedly impugned Gates's decision to exercise his constitutional right to bear arms, (9) the trial court erroneously denied his proposed jury instructions regarding self-defense, and (10) his right to present a defense was violated by the trial court's refusal to instruct the jury on justifiable homicide in resistance of a felony. After thoroughly reviewing these claims of error, we conclude that they are without merit.

Affirmed and remanded.

Dwyer, J.

WE CONCUR:

Bürk, J.    Chung, J.